No. 23-5543

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

_____

CENTURY ALUMINUM COMPANY, et al.,
*Plaintiffs-Appellants,*

—v.—

CERTAIN UNDERWRITERS AT LLOYD'S, et al.,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the
Western District of Kentucky
The Honorable H. Brent Brennenstuhl, Presiding
No. 4:18-cv-00118-HBB

_____

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS CENTURY
## ALUMINUM COMPANY, et al.

_____

Martin H. Myers
Yurij D. Melnyk
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

Palmer G. Vance II
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1380
Telephone: (859) 231-3968
Facsimile: (859) 253-1093

*Attorneys for Plaintiffs-Appellants*
*Century Aluminum Company, et al.*

**CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF-APPELLANT CENTURY ALUMINUM COMPANY**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1(a), Plaintiff-Appellant Century Aluminum Company states:

(a)     Is Century Aluminum Company a subsidiary or affiliate of a public-owned corporation?

No.

(b)     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

Glencore AG has beneficial ownership of 10% or more of Century Aluminum Company's common stock.

BlackRock, Inc. has beneficial ownership of 10% or more of Century Aluminum Company's common stock.

**CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF-APPELLANT
CENTURY KENTUCKY, INC.**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1(a), Plaintiff-Appellant Century Kentucky, Inc. states:

(a)     Is Century Kentucky, Inc. a subsidiary or affiliate of a public-owned corporation?

Century Kentucky, Inc. is a wholly-owned subsidiary of Century Aluminum Company.

(b)     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

*See* Century Aluminum Company's Corporate Disclosure Statement.

**CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF-APPELLANT CENTURY ALUMINUM OF KENTUCKY GENERAL PARTNERSHIP**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1(a), Plaintiff-Appellant Century Aluminum of Kentucky General Partnership states:

(a)     Is Century Aluminum of Kentucky General Partnership a subsidiary or affiliate of a public-owned corporation?

Century Aluminum of Kentucky General Partnership's sole partner is Century Aluminum Company.

(b)     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

*See* Century Aluminum Company's Corporate Disclosure Statement.

**CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF-APPELLANT
CENTURY ALUMINUM SEBREE LLC**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule 26.1(a), Plaintiff-Appellant Century Aluminum Sebree LLC states:

(a)     Is Century Aluminum Sebree LLC a subsidiary or affiliate of a public-owned corporation?

Century Aluminum Sebree LLC's sole member is Century Kentucky, Inc., a wholly-owned subsidiary of Century Aluminum Company.

(b)     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

*See* Century Aluminum Company's Corporate Disclosure Statement.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF APPELLANT CENTURY ALUMINUM COMPANY ........................................... i

CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF-APPELLANT CENTURY KENTUCKY, INC. ...................................................... ii

CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF-APPELLANT CENTURY ALUMINUM OF KENTUCKY GENERAL PARTNERSHIP ...................................................................................... iii

CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF-APPELLANT CENTURY ALUMINUM SEBREE LLC ....................................... iv

TABLE OF CONTENTS ......................................................................... v

TABLE OF AUTHORITIES ................................................................ vii

INTRODUCTION ................................................................................. 1

STATEMENT REGARDING ORAL ARGUMENT ........................... 4

STATEMENT OF JURISDICTION ..................................................... 5

STATEMENT OF THE ISSUES .......................................................... 6

STATEMENT OF THE CASE .............................................................. 7

      A.    Factual Background ....................................................... 7

           1.    Century Incurred Losses as a Result of the 2017-18 Closure of Locks on the Ohio River. ....................................... 7

           2.    Century Sought to Recover Its Losses Under the Cargo Policy Sold by Underwriters. .................................. 10

      B.    Procedural Background .................................................... 12

SUMMARY OF THE ARGUMENT .................................................. 15

ARGUMENT ...................................................................................... 17

STANDARD OF REVIEW ................................................................ 17

I.  The District Court Applied an Improper Test to "Physical Loss." .............. 19

    A.  The Plain, Ordinary Meaning of Physical Loss Applied by This Court Does Not Require "Permanent" Dispossession. ...................... 19

    B.  The Detainment of the Alumina by the USACE Is One of The Risks Covered.................................................................................... 23

II.  The District Court Erred in Finding the Cargo Policy's Sue and Labour Clause Inapplicable. .......................................................... 26

III.  The District Court Erred in Finding That the Cargo Policy's Shipping Expenses Clause Does Not Provide Coverage. ............................................. 33

CONCLUSION .................................................................................. 36

CERTIFICATE OF COMPLIANCE ...................................................... 37

CERTIFICATE OF SERVICE .............................................................. 38

DESIGNATION OF RELEVANT DOCUMENTS ................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aetna Cas. & Sur. Co. v. Commonwealth,*
179 S.W. 3d 830 (Ky. 2005) ........................................................... 35

*Am. Alt. Ins. Corp. v. Superior Ct.,*
135 Cal. App. 4th 1239 (2006) ................................................ 23, 26, 27

*Bituminous Cas. Corp. v. Kenway Contracting, Inc.,*
240 S.W.3d 633 (Ky. 2007) ....................................................... 18, 34

*Burdett Oxygen Co. of Cleveland v. Emps. Surplus Lines Ins. Co.,*
419 F.2d 247 (6th Cir. 1969) ............................................ 29, 31, 32, 33

*Deerfield Ins. Co. v. Warren Cnty. Fiscal Ct. ex rel. City Cnty.
Planning Comm'n,*
88 S.W.3d 867 (Ky. Ct. App. 2002) ................................................. 19

*Dep't of Revenue, Fin. & Admin. Cabinet v. Shinin' B Trailer Sales,
LLC,*
471 S.W.3d 309 (Ky. Ct. App. 2015) ............................................... 20

*Excel Energy, Inc. v. Cannelton Sales Co.,*
246 F. App'x 953 (6th Cir. 2007) ................................................... 30

*Hvide Marine Int'l, Inc. v. Emps. Ins. of Wausau,*
No. 88 CIV 1523 (LBS), 1989 WL 140280 (S.D.N.Y. Nov. 15,
1989) ...................................................................... 27, 28, 29

*Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.,*
866 F.2d 71 (3d Cir. 1989) ......................................................... 22

*Kemper Nat'l Ins. Cos. v. Heaven Hill Distilleries, Inc.,*
82 S.W.3d 869 (Ky. 2002) .......................................................... 18

*Kentucky Ass'n of Cntys. All Lines Fund Tr. v. McClendon,*
157 S.W.3d 626 (Ky. 2005) ......................................................... 18

*Nationwide Mut. Ins. Co. v. Nolan*,
    10 S.W.3d 129 (Ky. 1999) ...................................................................18

*Olivera v. Union Ins. Co.*,
    16 U.S. 183 (1818).................................................................................25

*Rawe v. Liberty Mut. Fire Ins. Co.*,
    462 F.3d 521 (6th Cir. 2006) ...............................................................18

*Reinold v. United States*,
    167 F.2d 556 (2d Cir. 1948) .................................................................24

*Santo's Italian Café LLC v. Acuity Ins. Co.*,
    15 F.4th 398 (6th Cir. 2021) ...........................................................21, 22

*Se. Mental Health Ctr., Inc. v. Pac. Ins. Co.*,
    439 F. Supp. 2d 831 (W.D. Tenn. 2006) ............................................21

*Seifert v. IMT Ins. Co.*,
    542 F. Supp. 3d 874 (D. Minn. 2021)...................................................22

*Sparks v. Trustguard Ins. Co.*,
    389 S.W.3d 121 (Ky. Ct. App. 2012) ............................26, 27, 34, 35

*State Farm Fire Cas. Ins. v. Aulick*,
    781 S.W.2d 531 (Ky. Ct. App. 1989) ....................................................1

*Stone v. Kentucky Farm Bureau Mut. Ins. Co.*,
    34 S.W.3d 809 (Ky. Ct. App. 2000) ......................................................1

*SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*,
    33 F.4th 872 (6th Cir. 2022) ................................................................17

*Swift Spindrift Ltd. v. Alvada Ins. Inc.*,
    175 F. Supp. 3d 169 (S.D.N.Y. 2016) ............................................24, 25

*Thomas v. State Farm Fire & Cas. Co.*,
    626 S.W.3d 504 (Ky. 2021)...................................................................19

*United Specialty Ins. Co. v. Cole's Place, Inc.*,
    936 F.3d 386 (6th Cir. 2019) ...............................................................18

*Universal Image Prods., Inc. v. Fed. Ins. Co.*,
  475 F. App'x 569 (6th Cir. 2012) ................................................21, 22

*Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*,
  57 F.4th 558 (6th Cir. 2023) ....................................................17, 18

**Statutes and Rules**

28 U.S.C. § 636(c) ..............................................................................5

28 U.S.C. § 1291 ................................................................................5

28 U.S.C. § 1332(a)(2) ........................................................................5

6th Cir. R. 28(b)(1)(A)(i) 30(g) ........................................................39

6th Cir. R. 30(g) ...............................................................................39

6th Cir. R. 34(a) .................................................................................4

Fed. R. App. P. 4(a)(1)(A) ..................................................................5

Fed. R. App. P. 32(a)(5) ....................................................................37

Fed. R. App. P. 32(a)(6) ....................................................................37

Fed. R. App. P. 32(a)(7)(B) ...............................................................37

Fed. R. App. P. 32(f) ........................................................................37

Fed. R. Civ. P. 56(a) .........................................................................17

Fed. R. Civ. P. 56(f)(2) .....................................................................30

Fed. R. Civ. P. 73 ...............................................................................5

**Other Authorities**

https://www.merriam-webster.com/dictionary/detention ........................................25

https://www.merriam-webster.com/dictionary/loss ...........................................20, 21

https://www.merriam-webster.com/dictionary/never ..............................................34

https://www.merriam-webster.com/dictionary/not ................................................33

https://www.merriam-webster.com/dictionary/physical ........................................... 20

https://www.merriam-webster.com/dictionary/restraining ..................................... 26

https://www.merriam-webster.com/dictionary/restraint .......................................... 26

https://www.oed.com/dictionary/loss_n1?tab=meaning_and_use#3887
7144 ................................................................................................................ 20

https://www.oed.com/dictionary/physical_adj?tab=meaning_and_use#
30455807 ........................................................................................................ 20

https://www.oed.com/dictionary/restraint_n?tab=meaning_and_use#2
5716572 ........................................................................................................ 26

https://www.oed.com/search/dictionary/?scope=Entries&q=detention ................. 26

**INTRODUCTION**

In this insurance dispute, the district court made fundamental errors of law in granting summary judgment to insurers who refused to pay Century Aluminum's covered losses from the government's closure of locks that stranded Century's alumina (a key raw material) on barges, well short of the Century plants that required a continuous and reliable supply of alumina to continue operations and avoid shutdown.

The basic principles of insurance policy interpretation are well-settled under Kentucky law. The terms of insurance policies are to be interpreted according to their plain and ordinary meaning "in light of the usage and understanding of the average person." *Stone v. Kentucky Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 811 (Ky. Ct. App. 2000). And should any terms be unclear, any ambiguities must be construed "in favor of the insured." *Id*. at 810-11. These principles reflect Kentucky's long-standing public policy that for insurance to be effective, insureds must be "entitled to the benefit of the protection" they have sought and "for which [they have] paid a premium." *State Farm Fire Cas. Ins. v. Aulick*, 781 S.W.2d 531, 533 (Ky. Ct. App. 1989). But the district court failed to abide by these cardinal principles.

Century Aluminum Company, Century Kentucky, Inc., Century Aluminum of Kentucky General Partnership, and Century Aluminum Sebree LLC

(collectively, "Century") operated aluminum smelting facilities in Hawesville and Sebree, Kentucky, along the Ohio River. Alumina is the critical raw material in the smelting process, and must be provided in a continuous supply to keep the smelter "pot-lines" at each plant running and avoid a "pot-line freeze" that shuts down the entire plant and requires tens of millions of dollars to restart. Alumina was delivered to Hawesville and Sebree by river barge, and was supplied under long-term contracts that guaranteed its availability.

To protect the critical supply of alumina and other cargos and to protect against the potential devastation of pot-line freezes, Century purchased a marine cargo insurance policy (the "Cargo Policy") from Certain Underwriters at Lloyd's London ("Underwriters"), a group of insurance syndicates operating out of the Lloyd's of London insurance marketplace. The Cargo Policy has limits including $20 million for any one vessel and $10 million for any one barge tow within the United States. Underwriters promised to protect Century against "all risks of physical loss of or damage" to Century's cargo while in the ordinary course of transit, and against various risks inherent in marine transport. This protection included business interruption coverage known as "Marine Consequential Loss," as well as coverage for costs Century incurred to avoid any imminent covered loss under the so-called "Sue and Labour" clause—the counterpart to provisions obligating Century to take action to avoid and mitigate losses.

In late 2017, Century's transport and supply of alumina was disrupted when the U.S. Army Corps of Engineers ("USACE") closed certain locks on the Ohio River, preventing timely or predictable passage of barges to Century's plants. Without regular alumina deliveries, and a consistent supply and inventory of alumina on hand, Century faced the economically devastating prospect of pot-line freezes and the complete shutdown of the Sebree and Hawesville plants, a loss that would have required an investment of tens of millions of dollars to restart the plants..  To avoid such shutdowns, and to meet its obligations under the Cargo Policy to avoid or mitigate imminent losses, it was necessary for Century to evaluate, devise, and employ alternative means to transport the alumina to its plants, including by truck and rail.  Century did so with dispatch, but incurred significant additional transportation costs, all of which it carefully documented. Underwriters paid a small portion of the costs, but declined to pay the large balance, and offered no reason or basis for their refusal.

All of the costs are covered under the plain language of the Cargo Policy. And Century, having paid its premiums for the Cargo Policy, was entitled to have Underwriters pay them as promised.

The district court, however, concluded otherwise, based on multiple, independent legal errors, each of which merits reversal.  First, the district court disregarded the controlling construction of the phrase "physical loss or damage" in

holding that despite Century's inability to access the cargo stranded on barges, it never was "lost." Second, the district court found USACE's restraint of the barges was not among the "Risks Covered" because it did not result in "seizure" of the vessels or "detriment" to Century's cargo, despite multiple authorities finding such temporary detainments sufficient under identical language. Third, rather than construe and apply the Marine Consequential Loss and Sue and Labour clauses according to their plain meaning, the district court relied exclusively on inapposite foreign authority to limit coverage based on a purported "object" of the Cargo Policy that is neither expressed in nor implied by the Cargo Policy's actual language. Fourth, the district court misconstrued the Shipping Expense clause, impermissibly reading into it an infinite temporal scope that renders it an illusory "Catch 22."

The district court's rulings cannot be reconciled with well-established Kentucky rules of insurance policy interpretation and this Court's binding precedent. The Court should reverse the district court's grant of summary judgment.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Sixth Circuit Rule 34(a), Century respectfully requests oral argument. Although the applicable rules of insurance policy construction are well-settled under Kentucky law and this Court's precedent, this appeal involves marine

cargo insurance policy provisions that have not frequently been the subject of litigation, certain of which have not been interpreted by this Court in a published decision. Therefore, argument will assist the Court in interpreting the Cargo Policy's terms and provisions and evaluating the parties' positions.

## STATEMENT OF JURISDICTION

The U.S. District Court for the Western District of Kentucky has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because this is an action between citizens of Delaware and Illinois and other states of the United States on the one hand, and a citizen or citizens of a foreign state on the other hand, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. The parties consented to Magistrate Judge H. Brent Brennenstuhl's exercise of jurisdiction to conduct all proceedings in the case and enter final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Notice, Consent, and Reference of Civil Action, RE 74, Page ID # 743-45.) The district court granted Certain Underwriters at Lloyd's Motion for Partial Summary Judgment in an Order issued on April 24, 2023. (Order, RE 116, Page ID # 2412.)

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because the district court entered a Final Judgment on its Order on May 12, 2023. (Judgment, RE 120, Page ID # 2418.) Century timely filed a Notice of Appeal on June 9, 2023. (Notice of Appeal, RE 121, Page ID # 2419-20.) *See* Fed. R. App.

P. 4(a)(1)(A). The appeal was docketed on June 12, 2023. (Docketing Letter, RE 122, Page ID # 2423.)

## STATEMENT OF THE ISSUES

Did the district court err in granting Underwriters' motion for partial summary judgment on the ground that Century's alumina cargo, which was stranded on barges detained by the USACE, was never "physically lost?"

Did the district court err in granting Underwriters' motion for partial summary judgment on the ground that the USACE's actions in detaining barges loaded with Century's alumina, which could not reach Century's plants was not among the "Risks Covered" because it did not result in "seizure" of the vessels or "detriment" to Century's cargo?

Did the district court err in granting Underwriters' motion for partial summary judgment that the Cargo Policy's Sue and Labour clause did not apply based on a theory that "the object of the contract was insuring the alumina against physical loss or damage, not insuring Century's plants against pot-line freeze?"

Did the district court err in granting Underwriters' motion for partial summary judgment on the Cargo Policy's Shipping Expense clause by reading into it an infinite temporal scope that renders it illusory?

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    Century Incurred Losses as a Result of the 2017-18 Closure of Locks on the Ohio River.

Century, a manufacturer of aluminum, operated aluminum smelting plants in Hawesville, Kentucky and Sebree, Kentucky. (Century's Opposition to Motion for Summary Judgment, RE 107, Page ID # 1963.) Alumina is a critical raw material in the aluminum smelting process. (*Id.*). When a plant's supply of alumina falls too low, the smelting process cannot continue. (Overview of Facts Related to Closures of The Ohio River, RE 107-1, Page ID # 1991.) When the process halts, the molten material in the smelter's electrolytic vessels (a "pot-line") freezes, and this now-waste material must be jack-hammered out of the vessels before the pot-line can operate again. (RE 107, Page ID # 1963-64.) Restarting production after a pot-line freeze can cost tens of millions of dollars. (*Id.*)

Century's aluminum smelters at Sebree and Hawesville required a consistent, uninterrupted supply of raw materials, which was secured under the long-term contracts. (RE 107, Page ID # 1964). To manufacture aluminum in required quantities and to avoid the prospect of a pot-line freeze, Century maintained supplies of alumina sufficient for twenty to thirty days of production at both Hawesville and Sebree. (*Id*.) Most of that alumina was transported to the plants using barges on the Ohio River. (Complaint, RE 1, Page ID # 5.) These

barges were loaded near the mouth of the Mississippi River at Gramercy, Louisiana and then traveled up the Mississippi and Ohio rivers. (RE 107, Page ID # 1964.) On the Ohio River, the barges had to pass through a series of locks and dams controlled by the USACE. (*Id.*, Page ID # 1965.) These locks and dams included Lock and Dam 52 ("Lock 52"), Lock and Dam 53 ("Lock 53"), and Smithland Lock and Dam ("Smithland"), all on the Ohio River. (*Id.*)

On or around September 6 and 7, 2017, the USACE began to repeatedly close Locks 52 and 53, reportedly due to deterioration and malfunction of the lock mechanisms. (RE 107, Page ID # 1965.) In total, Locks 52 and 53, as well as Smithland, were closed or otherwise impassable for at least seven periods from September 2017 through mid-January 2018. (*Id.*) During this time, Locks 52, 53, and Smithland were completely closed for at least thirty-two days. (*Id.*) The extended closures resulted in massive delays and barge traffic jams up the Ohio River, even during the intermittent periods when the locks were open. (*Id.*) These closures interrupted Century's transportation of alumina to the Hawesville and Sebree plants. (*Id.*, Page ID # 1966.) At times, Century's alumina supply fell far below the levels adequate to prevent a pot-line freeze, dropping to a level sufficient for only thirteen or fourteen days of production. (*Id.*) The closures also made it impossible for Century to predict or reliably schedule receipt of raw materials at the plants via barge—which on average has an eighteen-day lead time. (*Id.*)

Moreover, USACE made clear that it did not know how long these repeated closures would last. (RE 107, Page ID # 1965.) During the fall and early winter of 2017-2018, USACE stated that single delays at Locks 52 and 53 could last for long periods of *up to twenty days or more*. (*Id.*) Thus, neither Century, nor its barge operators, nor any other party had any way to determine how long the closures would actually last and whether the required alumina would make it to the plants. (*Id.*)

In light of the closures, and the uncertainty as to how long they would last, Century was forced to employ three alternative means of transporting alumina to Hawesville and Sebree. (Order, RE 116, Page ID # 2401-02.) First, Century diverted some barges to alternative facilities for offloading and subsequent trucking to Hawesville and Sebree. (RE 107, Page ID # 1966.) Second, Century rented specialized rail cars to transport alumina from Gramercy to Sebree (and then subsequently transported some of that alumina from Sebree to Hawesville). (*Id.*, Page ID # 1966-67.) Third, Century sent some barges loaded with alumina via the Tennessee-Tombigbee Waterway, a river system that avoided Locks 52 and 53, but not Smithland. (*Id.*, Page ID # 1967.) Due to operational and location-specific risks and concerns, Century, in consultation with its barge operators, determined that this waterway would not be a reliable replacement route. (*Id.*)

Century's operations and finance departments carefully tracked the costs of these alternative modes of transportation.  (RE 107, Page ID #1967)  In total, these costs exceeded $5 million.  (*Id*., Page ID # 1968.)

### 2. Century Sought to Recover Its Losses Under the Cargo Policy Sold by Underwriters.

Underwriters issued the Cargo Policy for the policy period March 15, 2017 to March 15, 2018.  (Complaint, RE 1, Page ID # 3.).  The Policy's wording is standard and approved by the Lloyd's of London market.  (RE 107, Page ID # 1969.)  The Cargo Policy provides broad coverage for a variety of marine cargo losses, and affords coverage for "all risks of physical loss or damage to" Century's cargos, including alumina "whilst in the ordinary course of transit."  (Policy, RE 1-2, Page ID # 20-21.)  The Cargo Policy also specifically protects against "perils . . . [of] inland waters . . . [including] restraints and detainments of all Kings, Princes and People of what nation, condition or quality soever . . . and of all other like perils, losses or misfortunes . . . of the said goods."  (*Id*., Page ID # 42.)

In addition, the Cargo Policy contains several separate and additional coverage clauses.  (*See* RE 1-2, Page ID # 22-47.)  Relevant here are the Extra Expense, Sue and Labour, Shipping Expense, and Marine Consequential Loss clauses.  (RE 116, Page ID # 2405-06.)

The "Extra Expense" clause provides $1 million in coverage for "additional expenses incurred by the Insured in attempting to prosecute an intended voyage

covered hereunder whether such attempt may ultimately prove successful or otherwise (including but not limited to extra chartering costs and/or storage costs and/or transhipment costs and/or guarantees and all other forwarding costs including by any alternative means of conveyance) as a result of one or more of" certain "occurrences." (RE 1-2, Page ID #27.)

The Sue and Labour clause provides that "in case of actual or imminent loss, damage, cost or expense, it shall be lawful and necessary for the Insured" to "sue, labour and travel for, in and about the defence, safeguard and recovery of the interests insured hereunder" or "to incur such other expenses as are reasonable and/or necessary for the purpose of reducing or attempting to reduce any potential loss or liability." (RE 1-2, Page ID # 43). Under the Sue and Labour clause, Underwriters "hereon agree to pay the charges described above in addition to amounts otherwise recoverable hereunder." (*Id.*) Further, where "necessary for the Insured" to "sue and labour" for "the purpose of reducing or attempting to reduce any potential loss or liability" (*Id.*), the Cargo Policy requires the insured "to take such measures as may be reasonable to avert or minimize loss," adding that "It should be noted that provided the expenses are reasonably and property incurred, and are also, [sic] as a result of the operation of an insured peril, then such expenses would be for Insurers' account." (*Id.*, Page ID # 35, 68.)

The Shipping Expenses clause provides that "[w]hen the subject matter insured is not delivered to the destination contemplated due to circumstances beyond the control of the Insured this insurance also to pay reasonable direct charges incidental to shipping which have been or may be incurred by the Insured." (RE 1-2, Page ID # 42-43.)

Finally, the Cargo Policy includes "Consequential loss as detailed elsewhere herein." (RE 1-2, Page ID # 20.) That refers to a corresponding Marine Consequential Loss clause that covers losses due to "production . . . falling short of the standard production . . . as a result of loss of or damage to or delay in the delivery of the property as described in the schedule hereto" caused by, among other things, "a risk which would be covered under the terms, clauses, and conditions of this insurance." (*Id*., Page ID # 31.)

## B.     Procedural Background

After Century submitted its formal written claim notice, Underwriters acknowledged coverage, but adopted the position that coverage was limited to the Cargo Policy's Extra Expense clause. (May 2018 Claim Correspondence, RE 99-11, Page ID # 1148.) Accordingly, Underwriters made partial payment to Century, but refused to recognize coverage under any of the Cargo Policy's other clauses and coverage grants. (RE 107, Page ID # 1968.) Century accepted that partial payment subject to a reservation of rights, but engaged in further negotiations with

Underwriters regarding Century's remaining losses. (*Id.*) Century provided detailed explanations as to why Underwriters' refusal to pay for all of Century's claimed losses resulting from the lock closures, and necessary alternative transportation costs incurred, was improper. (RE 1, Page ID # 7-8.) Underwriters, however, still did not acknowledge further coverage. (*Id.*) Indeed, Underwriters never even issued a written coverage position. (Century's Opposition to Partial Motion for Summary Judgment on Bad Faith, RE 106, Page ID # 1545).

On July 20, 2018, Century sued Underwriters in the Western District of Kentucky. (RE 1, Page ID # 1-14.) Century sought a declaratory judgment that all of the additional transportation costs it incurred were covered under the Cargo Policy, and that Underwriters were obligated to cover all of the claimed losses. (*Id.*) Century also alleged that Underwriters, in failing to reimburse Century for its claimed losses, breached the Cargo Policy. (*Id.*) Finally, Century sought relief for Underwriters' bad faith denial of Century's claim. (*Id.*)

On February 21, 2023, Underwriters moved for partial summary judgment, asking the district court to dismiss Century's declaratory relief and breach of contract causes of action. (Underwriters' Motion for Partial Summary Judgment, RE 100, Page ID # 1201-04.) The district court granted that Motion on April 24, 2023. (RE 116, Page ID # 2400-12.) According to the district court, Underwriters were entitled to summary judgment because "Underwriters has paid all that to

which it is obligated under the policy—namely the limits of coverage under the Extra Expense Clause." (*Id.*, Page ID # 2411.)

In granting summary judgment, the district court made several holdings at issue. First, the district court held that Century's cargo was never "'lost'" because Century was never "completely deprived of control" of its alumina. (RE 116, Page ID # 2408.) Second, the district court held that, because Century's cargo was not lost, "Century's shipping expenses were not incurred in the course of protecting the alumina from physical loss or damage," precluding coverage under the Sue and Labour clause. (*Id.*, Page ID # 2410). Third, the district court held that restraint of the alumina was not "by virtue of action by any 'Kings, Princes and People,'" because the USACE closures did not constitute "any manner of seizure" or "'detriment' . . . to" the cargo. (*Id.*, Page ID #2408.) Fourth, the district court held that the Shipping Expense clause did not apply because Century's alumina was "ultimately delivered to Century's plants" such that Century "realized the benefit of the expenses it incurred" and avoiding "a loss." (*Id.*, Page ID # 2411.).

Based on these erroneous theories, the district court held that, because Underwriters had "not breached its obligation" to pay "benefits under" the Cargo Policy, summary judgment was appropriate on Century's declaratory judgment and breach of contract claims. (*Id.*) The district court entered a Final Judgment on May 12, 2023. (Judgment, RE 120, Page ID # 2418.) This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court's conclusion that the additional transportation costs Century incurred as a result of the 2017 lock closures are not covered by the Cargo Policy is mistaken. According to the district court, those costs are not covered because the delays in and impossibility of transit via the Ohio River did not constitute a "loss," of alumina, the USACE's restraint of the barges did not constitute "seizure" of or "detriment to" the cargo, Century did not incur its additional transportation expenses "in the course of protecting the alumina from physical loss or damage," and "the benefit of the expenses it incurred" were realized because the alumina was "ultimately delivered to Century's plants." The district court's reasoning is erroneous for several reasons.

First, in concluding that the closure of the Ohio River did not cause Century to suffer a loss, the district court failed to construe the Cargo Policy according to its plain and ordinary meaning, as decided by this Court. Indeed, the district court did not even attempt to construe the Cargo Policy's undefined term "physical loss" and instead concluded, without reference to the Cargo Policy or binding precedent, that Century did not suffer a loss because Century was not "permanently deprived" of control or possession of the alumina on its barges. The plain and ordinary meaning of "physical loss" according to this Court does not require such permanent deprivation or dispossession.

Second, and in the same vein, the district court erred as a matter of law in finding that USACE's restraint of the barges was not among the Risks Covered because it did not result in "seizure" of the vessels or "detriment" to Century's cargo. No court has held a seizure is necessary to trigger this coverage, other authorities have found that temporary detainments sufficient to trigger it, and the district court ignored the plain meaning of detriment, which Century's alumina cargos certainly suffered.

Third, the district court relied upon inapposite, foreign authority to erroneously hold that the Cargo Policy's Sue and Labour clause did not apply because "the object of the contract was insuring the alumina against physical loss or damage, not insuring Century's plants against pot-line freeze." (RE 116, Page Id # 2410.) The alleged "object of the contract" is not controlling, or even recognized under controlling Kentucky law. Further, even if the "object of the contract" were relevant, had the district court properly interpreted "physical loss," Century's efforts to prevent loss via alternate transportation methods would satisfy this "object" test. And the district court failed to recognize that the Cargo Policy expressly covers "Marine Consequential Loss" from a pot-line freeze, which is but another "object" of the Cargo Policy according to its plain terms, and a separate and independent basis on which the Sue and Labour clause applies.

Fourth, the district court's conclusion that Century's additional transportation costs were not covered under the Shipping Expenses clause because the alumina ultimately reached the plants is not supported by the text of the Cargo Policy, is contrary to Kentucky's doctrine of illusory coverage, and places the insured in a "Catch 22." Under district court's reasoning, coverage under the Shipping Expenses clause is never available where an insured successfully complies with its duties under the Cargo Policy to mitigate a potentially covered loss such that cargo ultimately is "delivered."

Accordingly, and as explained in further detail below, this Court should reverse the Judgment.

## ARGUMENT

## STANDARD OF REVIEW

A district court's decision to grant summary judgment is reviewed de novo. *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*, 33 F.4th 872, 878 (6th Cir. 2022). "In reviewing the district court's grant of summary judgment," this Court must "draw reasonable inferences in favor of the nonmoving party." *Id.* Summary judgment is proper only if "there is no genuine dispute of material fact." *Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*, 57 F.4th 558, 561 (6th Cir. 2023); *see also* Fed. R. Civ. P. 56(a).

When summary judgment involves a "decision on the interpretation of an insurance contract," that interpretation also is reviewed de novo. *Westfield Nat'l Ins.*, 57 F.4th at 561. A federal court sitting in diversity, as is the case here, applies the substantive law of the forum state to questions of contract interpretation. *See Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 526 (6th Cir. 2006); *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 402 (6th Cir. 2019). Accordingly, Kentucky law controls the questions of insurance policy interpretation at issue.

Under Kentucky law, interpretation of an insurance policy begins with the text. *Kemper Nat'l Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky. 2002). "The words employed in insurance policies, if clear and unambiguous, should be given their plain and ordinary meaning." *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129, 131 (Ky. 1999); *see also Kentucky Ass'n of Cntys. All Lines Fund Tr. v. McClendon*, 157 S.W.3d 626, 630 & n.8 (Ky. 2005) ("Terms of insurance contracts have no technical meaning in law and are to be interpreted according to the usage of the average man and as they would be read and understood by him . . .").

If a policy is ambiguous, any ambiguity "is to be construed against the drafter . . . so as to effectuate the policy of indemnity" and "resolve all doubts in favor of the insured." *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240

S.W.3d 633, 638 (Ky. 2007).  Kentucky law requires courts to "'liberally

construe[]'" insurance policies "as a whole."  *Deerfield Ins. Co. v. Warren Cnty.*

*Fiscal Ct. ex rel. City Cnty. Planning Comm'n*, 88 S.W.3d 867, 873 (Ky. Ct. App.

2002) (quoting *Kentucky Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d

164, 166 (1992)).

## I.     The District Court Applied an Improper Test to "Physical Loss."

### A.     The Plain, Ordinary Meaning of Physical Loss Applied by This Court Does Not Require "Permanent" Dispossession.

While paying lip-service to the rule that insurance policy terms should be

given their plain and ordinary meaning (RE 116, Page ID # 2404), the district court

utterly failed to apply that rule and this Court's precedent to Century's "physical

loss" of the alumina stranded on barges.  That failure led the district court to

erroneously conclude Century had not suffered a "physical loss" recoverable under

the Cargo Policy.  (*Id.*, Page ID # 2409-10).

The Cargo Policy provides coverage for "all risks of physical loss or damage

to" Century's cargos, including alumina, from "any external cause."  (RE 1-2, Page

ID # 21.)  The Cargo Policy does not define "physical loss."  Under Kentucky law,

undefined terms in an insurance policy have "no technical legal meanings and must

be reasonably interpreted as they would be understood by a lay reader."  *Thomas v.*

*State Farm Fire & Cas. Co.*, 626 S.W.3d 504, 507 (Ky. 2021).  Accordingly,

courts routinely rely on lay dictionaries for the "common meaning" of an insurance

policy's undefined terms. *Dep't of Revenue, Fin. & Admin. Cabinet v. Shinin' B Trailer Sales, LLC*, 471 S.W.3d 309, 311 (Ky. Ct. App. 2015).

Dictionary definitions of "physical" and "loss" are particularly instructive and leave no doubt that Century suffered a physical loss of alumina from the lock closures. Dictionaries define physical as "having material existence," https://www.merriam-webster.com/dictionary/physical, as well as "relating to matter or the material world; tangible, concrete," https://www.oed.com/dictionary/physical_adj?tab=meaning_and_use#30455807. Meanwhile, dictionaries define loss as "detriment or disadvantage involved in being deprived of something," https://www.oed.com/dictionary/loss_n1?tab=meaning_and_use#38877144, or "the act or fact of being unable to keep or maintain something," "the partial or complete . . . absence of a physical capability or function," and "failure to . . . utilize." https://www.merriam-webster.com/dictionary/loss.

Under Kentucky law, giving "physical" and "loss" their plain and ordinary meanings and reading them together as a lay person would in the Cargo Policy, a physical loss occurs when any external cause results in Century being tangibly deprived of the ability to use its insured property in its ordinary manner. Century suffered such a loss here. When the USACE closed the locks, Century could not get the alumina stranded on the barges to the Hawesville and Sebree plants. (RE

107, Page ID # 1965-66.)  Century, therefore, was deprived of its ability to use the alumina for its ordinary purpose—to smelt aluminum.

This plain and ordinary meaning of "physical loss" is consistent with, if not mandated by, decisions of this Court and district courts in this circuit.  *See, e.g., Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401, 404-05 (6th Cir. 2021) (physical loss occurs when the insured has been "tangibly or concretely deprived" of its property); *Se. Mental Health Ctr., Inc. v. Pac. Ins. Co.*, 439 F. Supp. 2d 831, 837-38 (W.D. Tenn. 2006) (construing "physical loss of or damage to property" as including "loss of access, loss of use, and loss of functionality" of the insured's property); *see also Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 573-74 (6th Cir. 2012) (relying on cases finding physical loss is "simply one that relates to natural or material things" and authority holding that physical loss occurs when "real property becomes . . . substantially unusable"). The district court, however, did not construe "physical loss" according to its plain and ordinary meaning.  Instead, the district court simply stated that because "Century was at all times in control of the barges and cargo" and was not "permanently deprived" of possession of its cargo, the "cargo was never 'lost.'" (RE 116, Page ID # 2408.)

Neither the plain and ordinary meaning of "physical loss," under Kentucky law, nor this Court's decision in *Santo's Italian Café* (which Century raised in the

briefing below (RE 107, Page ID # 1974)) or any other authority includes the permanency element the district court imposed. The single authority the district court referenced to construe "physical loss" was the Third Circuit's decision in *Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*, 866 F.2d 71, 76 (3d Cir. 1989). According to the district court, *Intermetal* held that "cargo was lost because the owner was completely deprived of control of the cargo and never regained possession." (RE 116, Page ID # 2408.)

But the *Intermetal* Court did not rely on the fact that the insured there "never regained possession." *(Id.)* To the contrary, *Intermetal* states that "an absence of possession and control falls within the plain meaning of 'loss." 866 F.2d at 76. Accordingly, loss occurred when the insured "***temporarily*** lost the use and enjoyment of its equipment . . . as a result of a proper order of the court which temporarily relieved [the insured] of its possessory rights." *Id*. at 77 (emphasis supplied). Accordingly, *Intermetal* did not depend or turn on whether the insured "never regained possession." (RE 116, Page ID # 2408.) Many other courts have found physical loss where the insured's loss is temporary. *See, e.g.*, *Seifert v. IMT Ins. Co.*, 542 F. Supp. 3d 874, 876 (D. Minn. 2021) (physical loss can occur where government mandates ordering temporary business closure deprive insured of use of its "property as intended"); *see also Santo's Italian Café*, 15 F.4th at 404-405 (citing cases where courts "have held that a loss of ability to use property

22

sometimes may constitute a 'physical loss'"); *Am. Alt. Ins. Corp. v. Superior Ct.*, 135 Cal. App. 4th 1239, 1243 (2006) (detention of airplane was physical loss even though it was later "released" from "detention").

There is no doubt that the USACE lock closures deprived Century—albeit indefinitely and for an unknown period—of the ability to get the stranded alumina to the plants to use it to smelt aluminum and keep the plants running. But there is no doubt also that the alumina was physically lost for some period as a matter of Kentucky law, and the district court erred in finding it was not.

### B. The Detainment of the Alumina by the USACE Is One of The Risks Covered.

The district court's construction of the "Risks Covered" clause of the Cargo Policy in support of its "physical loss" analysis is also erroneous as a matter of law and requires reversal. The district court failed to apply the plain meaning of the language of Risks Covered clause, improperly imposed a "seizure" requirement, and ignored applicable precedent finding actions such as the USACE lock closures are indeed the exercise of sovereign power that satisfy the clause. In failing to apply the applicable rules of construction to the Risks Covered clause in support of its "physical loss" findings, the district court further failed to construe "physical loss" in light of the Cargo Policy as a whole, in further violation of applicable principles of construction.

The Risks Covered clause provides coverage for specific perils including "arrests, restraints and detainments of all Kings, Princes and People of what nation, condition or quality soever." (RE 1-2, Page ID #42). This clause and effectively identical versions of it have "been used in marine insurance contracts for centuries." *Swift Spindrift Ltd. v. Alvada Ins. Inc.*, 175 F. Supp. 3d 169, 181 (S.D.N.Y. 2016). Courts have interpreted the words "arrests, restraints, and detainments" to include a variety of actions such as "embargoes, blockades and seizures in which a government assumes general control over the movements of a vessel." *Reinold v. United States*, 167 F.2d 556, 558 (2d Cir. 1948). Notably, and as recognized by a leading industry treatise, the government's assumption of control need not be permanent or an actual seizure. *See* 9A Steven Plitt, et. al., Couch on Insurance § 137:53 (June 2023 Update) ("In an arrest, there is a *temporary* detention, with no design to deprive the owner of the vessel but to liberate or restore the ship or goods detained, or to pay the value thereof.") (emphasis supplied).

The district court, however, failed to properly interpret the Risks Covered clause. Without citation to any authority, and in defiance of logic and common sense, the district court stated that "to the extent the alumina was restrained or detained, it was not by virtue of any 'Kings, Princes, and People.'" (RE 116, Page ID # 2408.) To the contrary, "authority is unanimous that 'kings, princes, and

people' refers only to **governmental acts that take the form of an exercise of sovereign power**." *Swift*, 175 F. Supp. 3d at 183 (emphasis supplied). Here, it is beyond peradventure that the USACE's closure of the locks was a government act and exercise of sovereign power. Although Century may have retained some ownership interests in cargo on the barges, the USACE sovereign lock closures prevented those barges from proceeding to Hawesville and Sebree. Seizure is not required. *See Olivera v. Union Ins. Co.*, 16 U.S. 183, 194 (1818) ("restraint does not necessarily imply possession of the thing by the restraining power, it must be construed to comprehend the forcible confinement of a vessel in port, and the forcible prevention of her proceeding on her voyage" and thus prevention of that movement is "a peril within the policy").

Further, a proper interpretation of the Risks Covered clause makes clear that "arrests, restraints, or detainments" need not be permanent as the district court required. *See* 9A Steven Plitt, et. al., Couch on Insurance § 137:53 (June 2023 Update) ("In an arrest, there is a *temporary* detention . . . .") (emphasis supplied). Just as an "arrest" is a temporary state one may be under, and not the same as a conviction, "detention" and "restraint" themselves necessarily imply a temporary and not permanent condition.[1]

---

[1] For example, dictionaries define "detention" as "the act or fact of detaining or holding back" or "the state of being detained," https://www.merriam-
(continued…)

Thus, it is not and cannot be the case, as the district court concluded, that physical loss does not occur unless an owner is "completely deprived of control and cargo and never regained possession." If that were so, then the Risks Covered clause which, by its plain terms covers non-permanent perils, would result in an illusory coverage—a result prohibited by Kentucky law. *Sparks v. Trustguard Ins. Co.*, 389 S.W.3d 121, 129 (Ky. Ct. App. 2012) (explaining that illusory coverage arises where coverage "at least implicitly *given*" under certain policy provisions are "then *taken away*, whether by virtue of a prohibition or exclusion contained in the same policy, or by virtue of a strict legal definition").

## II. The District Court Erred in Finding the Cargo Policy's Sue and Labour Clause Inapplicable.

The district court also erred in finding that Century's additional transportation costs were not covered under the Cargo Policy's Sue and Labour clause. By its plain terms, that clause requires Underwriters to reimburse Century

---

webster.com/dictionary/detention, or as including "keeping back or withholding," https://www.oed.com/search/dictionary/?scope=Entries&q=detention, while a "restraint" is "an act of restraining : the state of being restrained," i.e., prevented "from doing, exhibiting, or expressing something," https://www.merriam-webster.com/dictionary/restraint & https://www.merriam-webster.com/dictionary/restraining, or "The action or an act of restraining, checking, or stopping something," https://www.oed.com/dictionary/restraint_n?tab=meaning_and_use#25716572. *See also Am. Alt. Ins. Corp. v. Superior Ct.*, 135 Cal. App. 4th 1239, 1243 (2006) (airplane was "released" from "detention").

for costs incurred to prevent or mitigate an imminent covered loss.[2]  The district

court, however, did not apply the plain meaning of these terms.  Rather, the district

court held that the Sue and Labour clause did not apply because "the object of the

contract was insuring the alumina against physical loss or damage, not insuring

Century's plants against pot-line freeze."  (RE 116, Page ID # 2410.)

That is wrong for many reasons.

As a threshold matter, under Kentucky law the scope of coverage afforded

by language in an insurance policy is not determined by the "object of the

contract."  Indeed, that concept is completely untethered from Kentucky or Sixth

Circuit law.  The district court apparently derived this "object of the contract" test

from an unpublished, non-binding decision applying inapplicable principles of

foreign law to inapposite facts: *Hvide Marine Int'l, Inc. v. Emps. Ins. of Wausau*,

No. 88 CIV 1523 (LBS), 1989 WL 140280 (S.D.N.Y. Nov. 15, 1989).  There, the

court held that the legal fees incurred by an insured in investigating a ship's

---

[2] The clause states, in relevant part:

> It is agreed that in case of actual or imminent loss, damage, cost or expense,
> it shall be lawful and necessary for the Insured, their Factors and Assigns, to
> sue, labour and travel for, in and about the defence, safeguard and recovery
> of the interests insured hereunder, or any part thereof, or to incur such other
> expenses as are reasonable and/or necessary for the purpose of reducing or
> attempting to reduce any potential loss or liability under this Contract
> without prejudice to this Insurance, and subject always to the terms,
> conditions, limitations and exclusions of this Insurance, the charges thereof
> shall be borne by the Insurers.

(RE 1-2, Page ID # 43.)

sinking, and defending the ship's operator in a negligence suit, were not recoverable under a marine insurance policy's sue and labour clause. *Id.* at *7. According to the court, those legal fees were not recoverable because the insured could "not show [the] required nexus between the coverage of the insurance policy and the expenses incurred." *Id.* The policy "covered loss or damage to the vessel" and the sue and labour clause in that case—unlike the clause here—expressly provided for reimbursement for costs incurred in the "defense, safeguard and recovery of ***the Vessel***, or any part thereof." *Id.* at *6-7 (emphasis supplied). Thus, in that case, "recovery of these litigation expenses would expand the scope of the sue and labor clause beyond its plain meaning and accepted interpretation." *Id.* at *7.

Here, by contrast, the Sue and Labour clause applies to "the defence, safeguard and recovery of ***the interests***" insured under the Cargo Policy. (RE 1-2, Page ID # 43; emphasis supplied.) Those interests include Century's cargos, including alumina "whilst in the ordinary course of transit" and Marine Consequential Loss resulting from a pot-line freeze. (*Id.*, Page ID # 20.) Unlike in *Hvide Marine*, where the insured sought to recover legal fees incurred in an investigation and legal action subsequent to its ship's loss, here, there is unquestionably a "nexus" between the Cargo Policy and the alternative shipping costs Century incurred to reduce or attempt to reduce imminent loss of alumina

(albeit of unknown duration) or Marine Consequential Loss from a pot-line freeze. (RE 107, Page ID # 1963-66.)  Having incorrectly and improperly adopted an inapplicable "object of the contract" test, the district court sidestepped a determination of whether the disputed facts Century submitted were sufficient to establish triable issues on the prospect that Century faced an "imminent loss." There is no question that Century established triable issues of fact on that question. (*See id.*, Page ID # 1965-66, 1977-78; R. Hardy Email, RE 107-10, Page ID # 2232-34; R. Hardy Email, RE 107-6, Page ID # 2180; Á. Hafberg Email, RE 107-9, Page ID # 2230; R. Hardy Email, RE 107-8, Page ID #2227-28, M. Harrison Dep. Tr., RE 107-3, Page ID # 2053, 2056-57; Expert Report of C. William Kinzeler II, RE 98-2, Page ID #951-55; R. Hardy Dep. Tr., RE 107-4, Page ID # 2090-92, 2094-99; J. Mahoney Dep. Tr., RE 107-5, Page ID # 2151-56.)

The district court's consideration of the concept of the Cargo Policy's purported "object" is at odds with Kentucky law's binding principles of contract interpretation, as it is not a court's role to engage in a *post hoc* analysis of what the parties meant for the object of the contract to be.  If Underwriters wanted to condition recovery under the Sue and Labour clause based on the "object" of the Policy, they needed to expressly do so in the Policy itself.  *See Burdett Oxygen Co. of Cleveland v. Emps. Surplus Lines Ins. Co.*, 419 F.2d 247, 250 (6th Cir. 1969) (declining to accept insurer's proposed policy interpretation where the insurer

"could have drawn up a policy unambiguously conditioning recovery for business interruptions solely upon the occurrence of insured property damage," but failed to do so).[3]  Underwriters did not, and the district court erred.

Even assuming, *arguendo*, that the district court was correct that "the object of the contract" bears any relation to the coverage that the Sue and Labour clause provides, the Court's limitation of the Cargo Policy's "object" merely to "protecting the alumina from physical loss or damage" does not support summary judgment for Underwriters.

First and most fundamental, because the district court erred as a matter of law in its determination of "physical loss or damage," even if the "object of the contract" was "protecting the alumina from physical loss," Century has established that it was in fact attempting to protect the alumina from physical loss by arranging

---

[3] Notably, Underwriters never even raised the issue of the "object of the contract" in the briefing on their motion, meaning that the issue was not briefed by the parties at all, and first surfaced in the district court's Order granting summary judgment.  While Underwriters argued that the Sue and Labour clause did not provide coverage because no "cargo was lost or destroyed to trigger coverage under the Sue and Labour Clause," (RE 110-1, Page ID # 1214), they never claimed that the "object of the contract" should control the clause's applicability, nor did they attempt to establish what exactly that "object" was.  Under Fed. R. Civ. P. 56(f)(2), a court may grant summary judgment "on grounds not raised by a party" only "after giving notice and a reasonable time to respond," and this Court has accordingly cautioned that granting summary judgment on an issue relating to which "the parties have provided little or no argument" may constitute an abuse of discretion.  *Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 959, 962 (6th Cir. 2007).  Century respectfully submits that it would be an abuse of discretion for the Court to permit the district court's "object of the contract" test to control or affect application of the Sue and Labour clause in these circumstances.

alternative transportation for alumina to prevent its temporary loss of use and Century's ability to deploy it in smelting aluminum. Second, the district court erred as a matter of law by failing to consider at all at least one other "object of the contract"—*i.e.*, the avoidance of Marine Consequential Loss, including the prospect of a pot-line freeze. As the district court acknowledged, the Cargo Policy expressly includes "Consequential loss as detailed elsewhere herein" among its covered interests. (RE 1-2, Page ID # 20; RE 116, Page ID # 2405.)

That coverage is "detailed" in the' Marine Consequential Loss clause, which provides coverage for "standing charges, debt service, or profit . . . due to the production during such period falling short of the standard production": a form of business interruption insurance. (RE 1-2, Page ID # 31.) The clause provides that coverage where the shortfall results from "loss of or damage to or delay in the delivery of the property as described in the schedule hereto." (*Id.*) And in the absence of any further "schedule" specific to this clause—which, per its title, is standard "form" language inserted into the policy (RE 107-19, Page ID# 2287-88)—a reasonable reading of the "property as described" that gives meaning to that language refers to the property and "Interest" insured under the Cargo Policy: *i.e.,* Century's cargo in transit, including the alumina. (RE 1-2, Page ID # 30-31).

Indefinite delays in the delivery of alumina to Hawesville and Sebree, resulting from its loss due to inaccessibility and un-usability, were highly likely to

have resulted in halted production, triggering costly pot-line freezes and production shortfalls.  (RE 107, Page ID # 1963-64.)  Indeed, the inventory levels of alumina in the fall of 2017 had fallen well below those necessary to maintain production and ensure the prevention of pot-line freeze.  (*See* RE 107, Page ID # 1965-66; RE 107-10, Page ID # 2232-34; RE 107-6, Page ID # 2180; RE 107-9, Page ID # 2230; RE 107-3, Page ID # 2053, 2056-57; RE 107-5, Page ID # 2151-56.).  Any resultant losses would have been covered under the Marine Consequential Loss clause.  And so, the expenses incurred to avoid and mitigate such losses are covered under the Sue and Labour clause, which promises to reimburse Century for reasonable measures it takes to avoid a covered loss.  Indeed,  this is the necessary counterpart to the Cargo Policy's repeated pronouncements that Century must undertake such measures.  It is particularly important to, and must be read in conjunction with  the Marine Consequential Loss clause, which imposes a "duty" on Century to "take such measures as may be reasonable for the purpose of averting or minimising" losses that clause covers.  (RE 1-2, Page ID # 37).

Thus, the text of the Cargo Policy makes plain and clear that another "object" of the Cargo Policy (should that be relevant) *was* "insuring Century's plants against pot-line freeze."  (*See* RE 116, Page ID # 2410.)  The district court's limitation of the Cargo Policy's "object" to "protecting the alumina from physical

loss or damage" ignores the language sweeping "Consequential loss" within the covered "Interest," and is plain, reversible error.  (*See id*.)

## III.    The District Court Erred in Finding That the Cargo Policy's Shipping Expenses Clause Does Not Provide Coverage.

The district court further erred in holding that the Cargo Policy's Shipping Expenses clause did not cover the additional shipping expenses because, according to the district court, the alumina "ultimately" was delivered to the plants.  The district court's construction is not supported by the text of the Cargo Policy itself, leads to absurd results, and, if adopted, would render the Shipping Expenses clause impermissibly illusory.

The Shipping Expenses clause provides that when the "subject matter insured *is not delivered* to the destination contemplated," Underwriters must "pay reasonable direct charges incidental to shipping" incurred by Century.  (RE 1-2, Page ID # 42-43) (emphasis supplied).  The Shipping Expenses clause's use of the term "not delivered" is significant, and makes clear why the district court's interpretation which may include ultimate "delivery" at *any time* in the future is contrary to the clause's plain and ordinary meaning.

When "not" is used as an adverb, as it is in the Shipping Expenses clause, it makes "negative a group of words or a word."  https://www.merriam-webster.com/dictionary/not.  The use of "not," however, does not connote an infinite temporal scope.  Indeed, the Shipping Expenses clause does not say "<u>never

delivered."  "Never," unlike, "not" connotes and includes a definitive temporal scope.  When "never" is used as an adverb it means "not ever; at no time; not in any degree; not under any condition."  https://www.merriam-webster.com/dictionary/never.  Had the Shipping Expenses clause used the term "never delivered," the district court's infinite temporal requirement could be understood, but that is not how Underwriters drafted the Shipping Expenses clause.  According to Underwriters, the shipping expense to get, say, cargo of fresh fish to a restaurant is not covered, so long as the spoiled fish is ultimately delivered.  The district court's conclusion that the Shipping Expense clause is inapplicable when the insured's goods are "ultimately delivered," (RE 116, Page ID # 2411), is contrary to the clause's plain a meaning—and, to the extent Underwriters' construction is reasonable, the Court must "resolve all doubts in favor of the insured" and construe it "against the drafter . . . so as to effectuate the policy of indemnity."  *Bituminous Cas. Corp.*, 240 S.W.3d at 638.

The district court's insertion of an infinite temporal scope into the Shipping Expenses clause is erroneous also because it impermissibly would render that clause illusory, in violation of applicable principles of construction.  Under Kentucky law, the doctrine of illusory coverage requires courts to interpret an insurance policy "so that it is not merely a delusion to the insured."  *Sparks*, 389 S.W.3d at 128.  Where a policy "at least implicitly" provides coverage "under its

provisions," a court may not interpret the policy's other terms in a manner that then takes away that coverage. *Id.* at 129. The district court's construction of the Shipping Expenses clause here, however, does just that.

Here, the Shipping Expenses clause extends coverage for incidental shipping expenses incurred when an insured's goods are not delivered. To then take away that coverage because the insured's actions to mitigate its losses—as expressly required under the policy—ultimately are successful, would make the promised coverage illusory. The district court's interpretation of the Shipping Expenses clause, thus "essentially denies the insured of most if not all of a promised benefit." *Id.* at 128. *See also Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W. 3d 830, 837 (Ky. 2005) ("We believe an insurance company should not be allowed to collect premiums by stimulating a reasonable expectation of risk protection . . . and then hide behind a technical definition to snatch away the protection"). Here too, the district court would create a "Catch 22" in light of the Cargo Policy's requirements that Century act to mitigate and avoid covered loss.

Accordingly, under a proper construction of the Shipping Expenses clause, coverage is available for the additional transportation costs Century incurred. The lock closures (events beyond Century's control) resulted in Century's alumina (the subject matter insured) not being delivered to the Hawesville and Sebree plants. In turn, Century arranged for alternative shipping methods to mitigate any potential

loss.  Therefore, pursuant to the Shipping Expenses clause, Underwriters must reimburse Century for the incidental shipping charges it incurred.

## CONCLUSION

The district court misapplied controlling law and misconstrued the plain language of the Cargo Policy.  For the foregoing reasons, Century respectfully requests that the Court reverse the district court's judgment and remand for further proceedings.

Respectfully submitted,

DATED: August 24, 2023

/s/ Palmer G. Vance II
Palmer G. Vance II
STOLL KEENON OGDEN PLLC
300 West Vine Street, Suite 2100
Lexington, Kentucky 40507-1380
Telephone: (859) 231-3968
Facsimile: (859) 253-1093

Martin H. Myers
Yurij D. Melnyk
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, California 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

*Attorneys for Plaintiffs-Appellants*
*Century Aluminum Company, et al.*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 7595 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14 point font.


Dated: August 24, 2023             /s/ Palmer G. Vance II
                                       Palmer G. Vance II

## CERTIFICATE OF SERVICE

This will certify that a true and accurate copy of the foregoing was served to the following via the Court's CM/ECF system on the 24th day of August 2023:

Bobby R. Miller Jr.
Ryan A. Hahn
MILLER HAHN PLLC
2660 West Park Drive, Suite 2
Paducah, KY 42001
Email: bmiller@millerlaw-firm.com
           rhahn@millerlaw-firm.com

Kyle S. Moran
PHELPS DUNBAR LLP
365 Canal Street, Suite 2000 New Orleans, LA 70130
Email: kyle.moran@phelps.com

COUNSEL FOR DEFENDANTS-APPELLEES

*/s/ Palmer G. Vance II*
Palmer G. Vance II

# DESIGNATION OF RELEVANT DOCUMENTS

Pursuant to Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g), the following documents from the district court are relevant to this appeal:

| Description | D. Ct. Docket # | Page ID Range | Date |
|---|---|---|---|
| Complaint | RE 1 | 1-14 | 7/20/2018 |
| Marine Cargo Insurance Policy (Policy No. B1353DC1703553000) | RE 1-2 | 17-69 | 7/20/2018 |
| Notice, Consent, and Reference of Civil Action to Magistrate Judge H. | RE 74 | 743-745 | 6/1/2021 |
| Expert Report of C. William Kinzeler II | RE 98-2 | 950-959 | 2/21/2023 |
| May 10, 2018 Claim Correspondence | RE 99-11 | 1148-1149 | 2/21/2023 |
| Underwriters' Motion for Partial Summary Judgment | RE 100 | 1201-1204 | 2/21/2023 |
| Underwriters' Memorandum in Support of Motion for Summary | RE 100-1 | 1205-1223 | 2/21/2023 |
| Century's Opposition to Defendants' Partial Motion for Summary | RE 106 | 1537-1564 | 3/14/2023 |
| Century's Opposition to Defendants' Motion for Summary Judgment | RE 107 | 1962-1989 | 3/14/2023 |
| Preliminary Overview of Facts Related to Closures of The Ohio | RE 107-1 | 1990-1991 | 3/14/2023 |
| Michelle Harrison Deposition Transcript | RE 107-3 | 2040-2071 | 3/14/2023 |
| Ross Hardy Deposition Transcript | RE 107-4 | 2072-2141 | 3/14/2023 |
| Jeffrey Mahoney Deposition Transcript | RE 107-5 | 2142-2178 | 3/14/2023 |
| Ross Hardy Email | RE 107-6 | 2179-2186 | 3/14/2023 |
| Ross Hardy Email | RE 107-8 | 2226-2228 | 3/14/2023 |

| | | | |
|---|---|---|---|
| Águst Hafberg Email | RE 107-9 | 2229-2230 | 3/14/2023 |
| Ross Hardy Email | RE 107-10 | 2231-2235 | 3/14/2023 |
| Tom Brand Deposition Transcript | RE 107-19 | 2281-2289 | 3/14/2023 |
| Memorandum Opinion and Order | RE 116 | 2400-2412 | 4/24/2023 |
| Judgment | RE 120 | 2418-2418 | 5/12/2023 |
| Notice of Appeal | RE 121 | 2419-2421 | 6/9/2023 |
| Docketing Letter | RE 122 | 2422-2425 | 6/12/2023 |