**NO. 23-5543**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

---

CENTURY ALUMINUM COMPANY, ET AL,

*Plaintiffs-Appellants,*

v.

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON,

*Defendants-Appellees.*

---

On Appeal from the United States District Court for the
Western District of Kentucky
The Honorable H. Brent Brennenstuhl, Presiding
No. 4:18-cv-00118-HBB

---

# BRIEF OF DEFENDANTS-APPELLEES
# CERTAIN UNDERWRITERS AT LLOYD'S, LONDON

---

Kyle S. Moran
Jeremy T. Grabill
PHELPS DUNBAR LLP
365 Canal St. | Suite 2000
New Orleans, Louisiana 70130
Telephone: (504) 566-1311
Facsimile: (504) 568-9130
kyle.moran@phelps.com
jeremy.grabill@phelps.com

Bobby R. Miller Jr.
Ryan A. Hahn
MILLER HAHN, PLLC
2660 West Park Drive, Suite 2
Paducah, KY 42001
Telephone: (270) 554-0051
Facsimile: (866) 578-2230
bmiller@millerlaw-firm.com
rhahn@millerlaw-firm.com

## CORPORATE DISCLOSURE STATEMENT OF DEFENDANTS-APPELLEES, CERTAIN UNDERWRITERS AT LLOYD'S, LONDON

Pursuant to Fed. R. App. P. 26.2 and 6 Cir. R. 26.1, Defendants-Appellees Certain Underwriters at Lloyd's, London make the following Corporate Disclosure Statement:

The lead underwriter to the Policy at issue in this action is Syndicate 2001. It is an unincorporated association, the managing agent of which is MS Amlin Underwriting Limited. The sole corporate member of Syndicate 2001 is MS Amlin Corporate Member Limited. MS Amlin Corporate Member Limited and MS Amlin Underwriting Limited are ultimately wholly owned subsidiaries of MS Amlin, plc, a company incorporated in England with its principal place of business in London. MS Amlin plc is a wholly owned subsidiary of Mitsui Sumitomo Insurance Company Limited, which is itself wholly owned by MS&AD Insurance Group Holdings, Inc., a company incorporated in Japan and listed on the Tokyo Stock Exchange and Nagoya Stock Exchange.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT OF
DEFENDANTS-APPELLEES, CERTAIN UNDERWRITERS
AT LLOYD'S, LONDON ..................................................................... ii

TABLE OF CONTENTS......................................................................... iii

TABLE OF AUTHORITIES ....................................................................v

STATEMENT REGARDING ORAL ARGUMENT ..............................1

STATEMENT OF THE ISSUES..............................................................1

STATEMENT OF THE CASE...................................................................2

    A.  Introduction............................................................................2

    B.  Factual Background ................................................................4

    C.  Procedural Background...........................................................7

SUMMARY OF THE ARGUMENT ......................................................8

ARGUMENT ........................................................................................10

    A.  Standard of Review..............................................................10

    B.  The District Court Properly Ruled That Century's Alumina Cargo
        Was Not Physically Lost or Damaged .....................................13

    C.  The District Court Properly Ruled That The Marine Cargo Policy's
        Sue and Labour Clause Did Not Provide Coverage For Century's
        Increased Transportation Costs ...............................................21

    D.  The District Court Properly Ruled That Century's Claim Was Not
        Covered Under The Policy's Shipping Expense Clause ..........29

    E.  The District Court Properly Ruled That Century's Claim Was Not
        Covered Under The Policy's Risks Covered Clause................31

CONCLUSION ................................................................................................36

CERTIFICATE OF COMPLIANCE ..............................................................38

CERTIFICATE OF SERVICE ........................................................................39

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .............40

# TABLE OF AUTHORITIES

## CASES

*Brock v. Ken-Lick & Tip Top Coal, Inc.*,
  912 F.2d 465 (6th Cir. 1990)..............................................................................10

*Conseco Fin. Servicing Corp v. Wilder*,
  47 S.W.3d 335 (Ky. Ct. App. 2001) ...................................................................11

*Estes v. Cincinnati Ins. Co.*,
  23 F.4th 695 (6th Cir. 2022) ................................................. 15, 16, 17, 18, 19, 21

*Fryman v. Pilot Life Ins. Co.*,
  704 S.W.2d 205 (Ky. 1986) .................................................................................11

*Holzknecht v. Kentucky Farm Bureau Mut. Ins. Co.*,
  320 S.W.3d 115 (Ky. Ct. App. 2010) ..................................................................11

*Hvide Marine Int'l, Inc. v. Employers Ins. of Wausau*,
  No. 88 CIV 1523 (LBS), 1989 WL 140280 (S.D.N.Y. Nov. 15, 1989)........25, 26

*Intermetal Mexicana, S.A. v. Ins. Co. of N. Am.*,
  866 F.2d 71 (3d Cir. 1989)...........................................................................33, 34

*Int'l Commodities Export Corp. v. Am. Home Assurance Co.*,
  701 F. Supp. 448 (S.D.N.Y. 1988)................................................................21, 22

*Kemper Nat'l Ins. Co. v. Heaven Hill Distilleries, Inc.*,
  82 S.W.3d 869 (Ky. 2002) ...........................................................................12, 13

*Kentucky Ass'n of Counties and All Lines Fund Trust v. McClendon*,
  157 S.W.3d 626 (Ky. 2005) ...................................................................11, 12, 13

*Mitchell v. Allstate Ins. Co.*,
  244 S.W.3d 59 (Ky. 2008) ...................................................................................10

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Papa John's Int'l, Inc.*,
  29 F. Supp. 3d 961 (W.D. Ky. 2014) ...................................................................31

*Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Vindarell Power Sys., Inc.*,
  611 F. Supp. 3d 1347 (S.D. Fla. 2020) .................................................................14

*Nationwide Mut. Ins. Co. v. Nolan*,
  10 S.W.3d 129 (Ky. 1999) .................................................................................11

*Pasha v. Commonwealth Land Title Ins. Co.*,
  2014 WL 5510931 (Ky. Ct. App. Oct. 31, 2014) ...............................................11

*Reinhold v. United States*,
  167 F.2d 556 (2d Cir. 1948).........................................................................34, 35

*Santo's Italian Café LLC. v. Acuity Ins. Co.*,
  15 F.4th 398 (6th Cir. 2021) .................................................................15, 19, 21

*Stone v. Kentucky Farm Bureau Mut. Ins. Co.*,
  34 S.W.3d 809 (Ky. 2000) .................................................................................11

*Swift Spindrift, Ltd. v. Alvada Ins. Inc.*,
  175 F. Supp. 3d 169 (S.D.N.Y. 2016).................................................................34

*Universal Image Productions, Inc. v. Fed. Ins. Co.*,
  475 F. App'x 569 (6th Cir. 2012) .......................................................................15

*Westfield Nat'l Ins. Co. v. Quest Pharms., Inc.*,
  57 F.4th 558 (6th Cir. 2023) ........................................................................10, 11

## RULES & STATUTES

Fed. R. Civ. P. 56(a)..............................................................................................10

Ky. Rev. Stat. Ann. § 304.14-360..........................................................................12

## OTHER AUTHORITIES

James K. Carroll, *4 Law and Prac. of Ins. Coverage Litig.*; Chap. 53 Ocean
  Marine Ins.
    § 53:19................................................................................................................14

10A Steven Plitt et al., *Couch on Insurance*
  § 148:46 (3d ed.) ....................................................................................15

Alan S. Gutterman, et al., *Going Global: A Guide to Building an International Business*
  § 9:16. Insurance (Nov. 2022 Update)...................................................2

**STATEMENT REGARDING ORAL ARGUMENT**

Defendants-Appellees, Certain Underwriters at Lloyd's London Subscribing to Policy Number B135DC1703553000 ("Underwriters" and the "Policy") do not believe that oral argument is necessary for disposition of the legal issues in this case. This coverage matter involves well settled principles of policy interpretation, and there are no novel issues involved in this appeal to necessitate oral argument.

**STATEMENT OF THE ISSUES**

Whether the District Court[1] properly granted Underwriters' Motion for Summary Judgment by ruling that:

a.    Century was not entitled to coverage in excess of the limits paid by Underwriters under the Extra Expense Clause because the cargo was not subject to physical loss or damage;

b.    Century was not entitled to coverage under the Sue and Labour Clause for its increased transportation costs because the interest insured under the Policy, namely Century's cargo in transit, was not subject to physical loss or damage;

---

[1] The parties consented to Magistrate Judge H. Brent Brennenstuhl's exercise of jurisdiction to conduct all proceeding in the case and enter final judgment pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

c.    Century was not entitled to coverage under the Shipping Expense Clause for its increased transportation costs because all of Century's cargo reached its intended destination; and

d.    Century was not entitled to coverage under the Policy's Risks Covered Clause for its increased transportation costs because Century's cargo was not seized during the lock closures, and Century retained control and possession of its cargo during the barge delays.

## STATEMENT OF THE CASE

### A.    Introduction

This is an insurance coverage dispute that arises out of a marine cargo insurance policy that Century purchased from Underwriters. Marine cargo insurance is the general category of insurance that covers various hazards and risks of physical damage to cargo in transit.[2] The insurance policy that Century purchased afforded coverage for Century's cargo (primarily, raw materials such as alumina) for all risks of physical loss or damage that might occur during the cargo's river transit to Century's aluminum plants in Kentucky.

Between September 2017 and January 2018, the U.S. Army Corps of Engineers intermittently closed locks along the Ohio River for repairs. In response

---

[2] Alan S. Gutterman, et al, *Going Global: A Guide to Building an International Business*, § 9:16. Insurance (Nov. 2022 Update).

to the lock closures, Century amended its business model and began to transport its cargo to its plants in Kentucky via truck and rail.  As a result of the changes to its business model, Century incurred increased transportation costs in addition to its customary barge transportation costs.

In November 2017, Century submitted a notice of claim to Underwriters for extra expenses and business interruption related to its increased transportation costs associated with shipping its alumina by alternate modes of transportation.  However, Century's claim notice did not identify any alumina cargo that had sustained physical loss or damage.

In July 2018, Underwriters paid Century the Policy's $1,000,000 sublimit of available coverage for Century's Extra Expense claim, minus Century's $25,000 deductible.  Unsatisfied with Underwriters response to its claim, Century filed its Complaint against Underwriters in this action seeking reimbursement under the marine cargo policy for the additional transportation costs Century incurred during the lock closures, among other relief.  Again, however, Century's Complaint did not identify any cargo that was physically lost or damaged during the lock closures and delays.

The District Court properly granted Underwriters' Motion for Summary Judgment.  On appeal, Century misconstrues the nature of the marine cargo insurance it purchased from Underwriters.  The Marine Cargo Policy provides

coverage for physical loss or damage to cargo in transit.  Except for limited Extra Expense coverage, which Underwriters paid, it does not provide coverage for the increased transportation costs Century incurred when it changed its business model regarding cargo transport, nor does it provide coverage for a so-called "pot-line freeze" at Century's plants.  This is coverage for which Century neither bargained nor paid under the Policy.[3]  Century received the limits of the available coverage, and Underwriters satisfied their obligation to Century when they paid the Extra Expense limits.  The District Court's ruling should be affirmed.

### B.    Factual Background

The relevant facts are undisputed.[4]  Century purchased a Marine Cargo Policy No. B135DC17035530000 (the "Policy") from Underwriters for the period March 15, 2017 through March 15, 2018.   The Policy covered all risks of physical loss or damage to the subject matter insured, namely cargo in transit, from any external cause.[5]

At the time of the claim, Century operated two aluminum plants in

---

[3] As Underwriters explained to the District Court, it is important to note that Trade Disruption Insurance, a type of business interruption insurance, was available to Century to purchase and would have responded to this type of loss.  Underwriters' Memorandum in Support of Motion for Summary Judgment (pages 11-12), RE 100-1, Page ID # 1215-1216.

[4] District Court's Memorandum Opinion and Order, RE 116, Page ID # 2401.

[5] Marine Cargo Insurance Policy, RE 100-2, Page ID # 1227.

Kentucky—one in Hawesville, Kentucky and the other in Sebree, Kentucky. The manufacturing process at the plants required raw materials, including alumina, that Century transported from its primary suppliers along the Gulf Coast. Century purchased its materials and loaded the cargo on barges to be shipped north on the Mississippi River, then on the Ohio River, and ultimately to the plants.[6]

Beginning in September 2017, the U.S. Army Corps of Engineers intermittently closed various locks on the Ohio River for repairs.[7] At the time of the lock closures, Century had eleven barges on the Ohio River. After the lock closures commenced, one barge continued its travel to its destination. Century off-loaded the cargo from the remaining ten barges onto trucks and that cargo was safely delivered to Century's two plants. It is undisputed that all the offloaded material from the ten barges reached its intended destination, and that none of the material was damaged, lost, or destroyed.

After the initial lock closures, Century chose to modify its business model regarding its cargo transportation plan by utilizing truck and rail transport to get its alumina to its plants. These changes to Century's business plan resulted in an increase in its transportation costs.[8] None of the cargo that Century transported via

---

[6] Complaint ¶ 17, RE 1, Page ID # 5.

[7] Complaint ¶ 18, RE 1, Page ID # 5.

[8] Complaint ¶¶ 20-22, 25, RE 1, Page ID # 5-6.

its alternate transportation plans was physically lost or damaged in transit.[9] Moreover, all the cargo Century transported via its alternate transportation methods reached its intended destination—the plants in Hawesville and Sebree.[10]

On November 13, 2017, Century's insurance broker in the United Kingdom, Jared Prince of JLT Specialty, provided Underwriters with written notice of Century's claim for extra expense and business interruption. The claim purported to represent losses associated with shipping alumina and other raw materials by alternate modes of transportation to Century's plants due to lock closures on the Ohio River. However, the claim did not reference any cargo that was physically damaged or lost.[11] Rather, the claim referenced Century's expenses related to its decision to transport the alumina to its plants via truck and rail rather than by barge. Century alleged in its claim that the additional transportation costs incurred under its new business model were necessary to avoid a plant shutdown, or so-called pot-line freeze. Even though the Policy does not insure against a potential pot-line freeze at Century's plants, Underwriters investigated the claim in accordance with the Policy's terms and conditions.

In May 2018, and in conformance with Policy requirements, Underwriters

---

[9] Itemization of Undisputed Facts ¶ 30, RE 100-20, Page ID # 1371.

[10] Itemization of Undisputed Facts ¶ 31, RE 100-20, Page ID # 1371.

[11] New Cargo Loss Report, RE 100-4, Page ID # 1279.

provided their coverage position to Century's broker in the United Kingdom, and he in turn reported Underwriters' decision to Century's broker in the United States. Underwriters agreed to pay Century the limits of coverage of $1,000,000 (less a $25,000 deductible) pursuant to the Policy's Extra Expense Clause.[12] Underwriters also confirmed that no additional coverage was available under the Policy. On July 23, 2018, Underwriters paid Century the Policy's $1 million Extra Expense sublimit less Century's deductible of $25,000.[13]

### C. Procedural Background

On July 20, 2018—three days <u>before</u> Century accepted Underwriters' payment of its claim under the Policy's Extra Expense sublimit—Century filed its Complaint against Underwriters in this action. Century sought coverage under the Extra Expense Clause, the Shipping Expense Clause, and the Sue and Labour Clause.[14] Century's Complaint sought a declaratory judgment and alleged breach of contract regarding the Policy. The Complaint also alleged violations of Kentucky's claim handling and bad faith statutes.

On February 21, 2023, Underwriters moved for summary judgment on

---

[12] Email from J. Prince to N. Rodier dated May 10, 2018, RE 100-7, Page ID # 1305.

[13] Email from N. Rodier to J. Prince dated July 23, 2018, RE 100-8, Page ID # 1307.

[14] *See generally* Complaint, RE 1, Page ID # 1.

Century's claims for declaratory judgment and breach of contract.[15]  Underwriters also moved for partial summary judgment regarding Century's claims of bad faith and statutory violations.[16]  On April 24, 2023, the District Court entered its Memorandum Opinion and Order granting Underwriters' Motion for Summary Judgment on Century's claims for declaratory relief and breach of contract, based on its finding that Underwriters paid Century all that they were obligated to pay under the Policy.[17]  The District Court entered a Final Judgment on May 12, 2023,[18] and Century filed its Notice of Appeal on June 9, 2023.[19]

## SUMMARY OF THE ARGUMENT

The District Court properly granted Underwriters' Motion for Summary Judgment because Underwriters satisfied their obligations to Century under the Policy when they paid the limits of available coverage under the Extra Expense Clause.  The relevant facts are undisputed.  Century purchased a marine cargo

---

[15] Underwriters' Motion for Summary Judgment, RE 100, Page ID # 1201-1223.

[16] Underwriters' Motion for Partial Summary Judgment on Bad Faith and Punitive Damages Claims, RE 99, Page ID # 1014-1017.

[17] Memorandum Opinion and Order, RE 116, Page ID # 2400-2412.  The District Court's ruling rendered moot Underwriters' separate Motion for Partial Summary Judgment on Bad Faith and Punitive Damage Claims.

[18] Final Judgment, RE 120, Page ID # 2418.

[19] Notice of Appeal, RE 121, Page ID # 2419-2421.

insurance policy to which Underwriters subscribe. The Policy covers alumina as cargo in transit against the risks of physical loss or damage. Other than the Extra Expense Clause, each of the Policy clauses requires physical loss or damage to the cargo to trigger coverage. The District Court properly concluded that none of Century's alumina cargo was subject to physical loss or damage, such that no additional coverage was available under the Policy.

Likewise, the District Court properly determined that the Sue and Labour Clause of the Policy did not provide coverage for Century's increased transportation costs. The Sue and Labour Clause provides coverage for the interests insured under the Policy, and the District Court properly identified the insured interest as the alumina cargo in transit, subject to physical loss or damage. The District Court did not create an "object of the contract" test as erroneously argued by Century. After identifying the subject matter insured, the District Court properly determined that the interest insured did not include a potential pot-line freeze at Century's plants.

The District Court also appropriately determined that the Policy's Shipping Expense Clause did not provide coverage for Century's claim because all cargo was ultimately delivered to its destinations, namely Century's plants.

Finally, the District Court properly determined that Underwriters were not obligated to provide coverage under the Risks Covered Clause, because the lock closures by the Corps of Engineers did not operate as a seizure of the barges.

Moreover, Century was not deprived of its ownership of, or access to, its cargo during the barge traffic delays as contemplated by the Risks Covered Clause.

Accordingly, the District Court correctly granted Underwriters' Motion for Summary Judgment, and the District Court's ruling should be affirmed.

## ARGUMENT

### A.    Standard of Review

This Court's review of the District Court's summary judgment regarding the interpretation of an insurance contract is *de novo*.[20]    Summary judgment is appropriate when there is no genuine issue of material fact, entitling the movant to summary judgment as a matter of law.[21]    Here, the issues before the Court are solely legal and there are no genuine issues of disputed fact.

Both Kentucky state courts and federal courts applying Kentucky law have granted summary judgment on the issue of whether an insurance policy provides coverage.[22]    To withstand Underwriters' motion, the burden is on Century to

---

[20] W*estfield Nat'l Ins. Co. v. Quest Pharms., Inc*., 57 F.4th 558, 561 (6th Cir. 2023) (affirming district court's grant of summary judgment to insurer because claim was not covered within meaning of commercial general liability policy).

[21] *Id.*; *see also* Fed. R. Civ. P. 56(a).

[22] *Brock v. Ken-Lick & Tip Top Coal, Inc.*, 912 F.2d 465 (6th Cir. 1990); *Mitchell v. Allstate Ins. Co.*, 244 S.W.3d 59 (Ky. 2008).

establish that its claim falls within coverage of the Policy.[23]  The parties do not

dispute that Kentucky contract law applies to the interpretation of the Policy.  In

accordance with Kentucky law, an insurance policy is a contract between the insurer

and the insured and, as a matter of public policy, should be enforced as written.[24]

Insurance policies must be interpreted in accordance with the parties' mutual

understanding at the time they entered the contract and based on the plain language

of the contract.[25]  Moreover, terms in a policy are given their plain and ordinary

meaning, and words with "no technical meaning in law" are interpreted in

accordance with common use and understanding.[26]  Policy terms that are clear and

unambiguous are enforced as drafted,[27] and coverage cannot be extended beyond the

terms of the policy.[28]  Finally, policy terms cannot be disregarded, as every insurance

---

[23] *Pasha v. Commonwealth Land Title Ins. Co.*, 2014 WL 5510931 (Ky. Ct. App. Oct. 31, 2014).

[24] *Conseco Fin. Servicing Corp v. Wilder*, 47 S.W.3d 335 (Ky. Ct. App. 2001).

[25] *Westfield*, 57 F.4th at 561 (citing *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W. 3d 129, 131-32 (Ky. 1999)).

[26] *Id.* (citations omitted); *see also Stone v. Kentucky Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 810-11 (Ky. 2000) (citing *Fryman v. Pilot Life Ins. Co.*, 704 S.W.2d 205 (Ky. 1986)).

[27] *Westfield*, 57 F.4th at 561-62 (citing *Holzknecht v. Kentucky Farm Bureau Mut. Ins. Co.*, 320 S.W.3d 115, 118 (Ky. Ct. App. 2010) (affirming summary judgment for insurer where claim was subject to policy exclusion)).

[28] *Kentucky Association of Counties and All Lines Fund Trust v. McClendon*, 157 S.W.3d 626 (Ky. 2005).

contract must be construed according to the entirety of its terms and conditions.[29]

Kentucky's rules of policy interpretation are clear enough that even the decisions cited by Century regarding policy interpretation support both Underwriters' coverage position and the District Court's summary judgment ruling. For example, in *Kemper National Insurance Co. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky. 2002), the Kentucky Supreme Court reversed a lower appellate court and reinstated the trial court's summary judgment in favor of an insurer where the parties disputed the application of an exclusion under a commercial general liability policy.[30]  In reinstating the trial court's summary judgment for the insurer on the issue of coverage, the Kentucky Supreme Court emphasized that an insurance contract must be interpreted without disregarding or inserting words or clauses.[31]

Similarly, in *Kentucky Association of Counties & All Lines Fund Trust v. McClendon*, 157 S.W.3d 626 (Ky. 2005), a case also relied upon by Century, the Kentucky Supreme Court reversed the appellate division and reinstated the trial court's summary judgment to an insurer that sought a declaratory judgment against

---

[29] Ky. Rev. Stat. Ann. § 304.14-360.

[30] Century's Opening Brief, Doc. 21, ECF Page 29.

[31] *Kemper Nat'l Ins. Co.*, 82 S.W.3d at 875-76.

the claims of its insured.[32]  In discussing the rules of policy interpretation, the

Kentucky Supreme Court emphasized that it is not enough for one party to claim

ambiguity, and a party's attempts to "muddy the water" and create an issue of policy

interpretation where none exists does not create an ambiguity.[33]

In relying on *Kemper* and *Kentucky Association*, Century is reading phrases

in those cases in isolation, not as a whole, just as it reads various Policy clauses in

isolation without applying the overarching requirement that the insured cargo sustain

physical loss or damage to trigger coverage.  Neither Century's incomplete case

analyses nor its piecemeal Policy interpretations are proper bases to disrupt the

District Court's sound and well-reasoned decision.

### B. The District Court Properly Ruled That Century's Alumina Cargo Was Not Physically Lost or Damaged

Century purchased a marine cargo policy that afforded coverage for Century's

raw materials against all risks of physical loss or damage from any external cause

while the cargo is in transit.  The Policy's conditions explain that the Policy

incorporates and is "Subject to the American Institute Cargo Clauses (Sept. 1, 1965)

32B-10."  Clause No. 3 is amended in the Policy to insure:

---

[32] Century's Opening Brief, Doc. 21, ECF Page 29.

[33] *Kentucky Ass'n of Counties All Lines Fund Trust*, 157 S.W.3d at 633 (citations omitted).

> Against all risks of **physical loss of or damage to** the subject-matter insured from any external cause.[34]

The "all risks" language does not expand coverage to any conceivable losses. Rather, based on the Policy's plain terms, coverage applies only when there is physical loss or damage to the cargo in transit.[35]

In its opening brief to this Court, Century initially relies upon dictionary entries rather than caselaw to support its creative definition of physical loss.[36] But Century's reliance on piecemeal dictionary definitions is not relevant to policy interpretation where, as here, Sixth Circuit precedent provides all applicable definitions of "physical loss" and damage.

The analysis of the physical loss requirement in a marine cargo policy is similar to the analysis applied to a property insurance policy.[37] In this context, there

---

[34] Marine Cargo Insurance Policy, RE 100-2, Page ID # 1227 (emphasis added).

[35] The Policy's Extra Expense sublimit of $1 million is the sole coverage provision that is not subject to the physical loss or damage requirement. The Extra Expense is separate coverage purchased by Century and the Policy specifically reflects that "[n]otwithstanding anything herein to the contrary, this insurance **is also to indemnify the Insured** for up to USD 1,000,000 each and every loss and in the aggregate per annum in respect of additional expenses incurred by the Insured in attempting to prosecute an intended voyage covered hereunder . . ." Marine Cargo Insurance Policy, RE 100-2, Page ID # 1233 (emphasis added).

[36] Century's Opening Brief, Doc. 21, ECF Page 31.

[37] *Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Vindarell Power Systems, Inc.*, 611 F. Supp. 3d 1347, 1354 (S.D. Fla. 2020); James K. Carroll; 4 *Law and Prac. of*

must be tangible physical damage to implicate coverage.[38]  As in a property claim, the common use and understanding of the term "physical loss" precludes those claims against an insurer "when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property."[39]

Century recognizes the similarities between the "physical loss" analysis in property and marine cargo policies as reflected in its reliance on the COVID-related decision, *Santo's Italian Café LLC v. Acuity Insurance Co.*, 15 F.4th 398 (6th Cir. 2021).[40]  As in *Santo's*, the physical loss condition as a necessity to trigger insurance coverage has been evaluated over 100 times in the last few years in the context of COVID-related property claims around the country.  The common theme in these cases involves an insured claiming loss under a property insurance policy for loss of use of its facilities due to COVID shutdown orders, and every Circuit that has considered this issue has required tangible "physical loss" to trigger coverage.[41]

---

*Ins. Coverage Litig.*; Chap. 53 Ocean Marine Ins. § 53:19. The cargo policy-Covered risk.

[38] *Universal Image Productions, Inc. v. Fed. Ins. Co.,* 475 F. App'x 569, 573 (6th Cir. 2012).

[39] 10A Steven Plitt et al., *Couch on Insurance* § 148:46 (3d ed.).

[40] Century's Opening Brief, Doc. 21, ECF Page 32.

[41] *See Estes v. Cincinnati Ins. Co.*, 23 F.4th 695, 701 (6th Cir. 2022).

This Court's recent decision in *Estes v. Cincinnati Insurance. Co.*, 23 F.4th 695 (6th Cir. 2022), is particularly instructive. In *Estes*, the insured dentist was restricted from using his office premises for non-emergency procedures from March 16, 2020 until April 27, 2020 during government shutdown orders due to COVID, although he was permitted to perform emergency procedures and operations during this time.[42] Estes later filed a claim under a commercial property policy's Business Income Loss, Extra Expense, Civil Authority, and Ingress and Egress and Dependent Property coverage as well as the Sue and Labour provision, and the insurer denied the claim because the insured property did not experience physical loss. In response to the complaint, the insurer filed a motion to dismiss that the district court granted.[43] On appeal, this Court affirmed the district court's ruling, holding as matters of first impression under Kentucky law that: 1) losses sustained by an insured during COVID shutdowns did not qualify as "direct physical loss"; and 2) losses sustained by the insured as a result of the state government's shutdown orders did not qualify as direct physical losses.[44]

The insurance policy in *Estes* provided coverage for "direct" "physical loss" to Estes' covered property, including his dental offices. This Court noted that the

---

[42] *Id.* at 697-98.

[43] *Id.* at 698-99.

[44] *Id.* at 699-701.

parties' dispute depended on the meaning of physical loss and whether the shutdown orders caused a direct physical loss to the insured's property.[45] To resolve this issue, the Court reviewed the unambiguous policy language and determined that the "average person" would determine that the phrase "physical loss" means that the owner has been tangibly deprived of the property or that the property was destroyed.[46] In affirming the district court's dismissal, this Court further determined that the average person would not find "physical harm" occurred to Estes' dental office due to the pandemic shutdowns where Estes' claims related to alleged "detrimental economic impact," reasoning that COVID did not destroy the offices and the government orders did not dispossess the insured of his offices for a single day.[47] The Court also noted that Estes did not identify any property that was destroyed by either COVID or the government shutdown orders.[48]

This Court in *Estes* underscored that every federal Circuit Court to consider this question of physical loss has read the relevant language to require a tangible destruction or deprivation of property.[49] Here, Century cannot satisfy these

_____

[45] *Id.* at 699.

[46] *Id.* at 699-700.

[47] *Id.* at 700.

[48] *Id.* at 702.

[49] *Id.* at 701.

requirements where it has failed to identify any cargo that was physically damaged, and it was never deprived of the ownership or use of its cargo. Rather, Century retained ownership of, and access to, its cargo during the lock closures. Similar to Estes' ability to access his dental office, Century could, and did, access its alumina during the lock closures, and offloaded it from the barges for delivery to its plants. Moreover, just as the insured in *Estes* failed to identify any property that COVID or the government shutdown orders destroyed, Century cannot identify any property that was destroyed by the lock closures. Finally, as the Court noted in *Estes*, the insured there purchased "a property insurance policy, not a profit insurance policy."[50] Likewise, Century bought a marine cargo insurance policy, not a business interruption or trade disruption policy. Here, as in *Estes*, the claims of economic harm are insufficient to support Century's claim for coverage under its marine cargo insurance policy. Clearly, the recent decision in *Estes* further indicates that the District Court's ruling that Century's cargo was not physically lost as required to trigger additional coverage under the Policy was correct.

The Court in *Estes* also noted that a holistic reading of all policy provisions demonstrated that direct physical loss was necessary to trigger coverage.[51] A holistic

---

[50] *Id.* at 700.

[51] *Id.* at 700.

reading of Century's marine cargo policy likewise supports the requirement for physical loss or damage to trigger coverage. For example, the Policy contains a Claims Procedure, Sections 1.1 – 1.8, that requires the insured to provide information in the event of loss or damage, including the vessel name, the bill of lading, port of loading and discharge, warehouse name and location, holding certificates, receipts or warrants, description of the subject matter insured, subject matter location, and brief circumstance of loss.[52] These Claims Procedures clearly anticipate specific loss or damage to the cargo and a holistic reading of the Policy at issue here also confirms that coverage is only triggered if cargo is subject to a tangible physical loss or damage.

Century relies on a pre-*Estes* decision, *Santo's Italian Café LLC v. Acuity Insurance Co.*, 15 F.4th 398 (6th Cir. 2021), to support its misguided argument that its cargo was "lost" to Century when its river travel was delayed. But again, a thorough reading of *Santo's* underscores the requirement for "physical loss or damage" to trigger additional coverage obligations by Underwriters. In *Santo's*, the insured restaurant filed a declaratory action against its insurer for losses stemming from COVID shutdown orders.[53] The insured asserted that revenue losses related to

---

[52] Marine Cargo Insurance Policy, RE 100-2, Page ID # 1272.

[53] *Santo's Italian Café LLC v. Acuity Ins. Co*., 15 F.4th 398, 400 (6th Cir. 2021).

in-premises dining were covered under its commercial property insurance policy.[54]

The policy limited recovery for lost business income caused by "direct physical loss of or damage to property."[55] It was undisputed that the shutdown order required the insured to suspend in-premises dining and that the insured lost business due to the suspension. However, the insured and the insurer disputed whether the pandemic-triggered government order barring in-person dining at a restaurant amounted to "direct physical loss of or damage to" the property.[56] The policy did not define the terms "direct physical loss or damage," but this Court gave them their "common and ordinary" meaning.[57] In so doing, the Court recognized the definition of "an immediate, tangible deprivation of property," and determined that the policy did not cover the alleged loss. The Court further underscored that the restaurant was not tangibly destroyed, and the owner still owned the restaurant and everything in the space.[58] Moreover, the Court held that "[a] loss of use simply is not the same as a physical loss."[59]

---

[54] *Id.* at 400-401.

[55] *Id.* at 400.

[56] *Id.* at 400.

[57] *Id.* at 402-03.

[58] *Id.*

[59] *Id.*

Century's claim is similar to those considered, and rejected, in *Estes* and *Santo's*. Century has not identified any cargo that was physically lost or damaged as a result of the lock closures. Rather, Century only asserts that it was deprived of its use when the alumina was delayed during transport. Century's argument is nonsensical. The allegedly "lost" alumina was never destroyed, Century maintained its ownership of the alumina at all times, and all such cargo was safely delivered to Century's plants. Like the insured in *Santo's*, Century has no support for its argument that physical loss is not required to trigger coverage under the Marine Cargo Policy. Based on the rulings in *Estes*, *Santo's*, and the overwhelming recent authority examining this issue, the District Court properly determined that Century's cargo was not subject to tangible physical loss or damage required to trigger additional coverage under the Policy and properly granted Underwriters' Motion for Summary Judgment.

### C. The District Court Properly Ruled That The Marine Cargo Policy's Sue and Labour Clause Did Not Provide Coverage For Century's Increased Transportation Costs

In general terms, "sue and labour" clauses place a requirement on the insured "to take measures to preserve the subject matter of the insurance policy."[60] The insurer is obligated to reimburse the insured for expenses incurred to avoid or

---

[60] *Int'l Commodities Export Corp. v. Am. Home Assurance Co.*, 701 F. Supp. 448, 452 (S.D.N.Y. 1988).

mitigate a <u>covered</u> loss.[61]  Here, the District Court noted examples of expenses that might be recoverable under the Policy's Sue and Labour Clause, such as transportation costs "incurred in the course of protecting the alumina from physical loss or damage, such as transferring cargo from a sinking vessel or re-routing the cargo to avoid a hurricane."[62]  Of course, Century did not incur any such expenses.

The Policy's Sue and Labour Clause provides coverage in the event of actual or imminent loss, damage, cost or expense as follows:

> **Sue and Labour Clause**
>
> It is agreed that in case of actual or imminent loss, damage, cost or expense, it shall be lawful and necessary for the insured, their Factors and Assigns, to sue, labour and travel for, in and about the defense, safeguard and recovery of the **interests insured hereunder**, or any part thereof, or to incur such other expenses as are reasonable and/or necessary for the purpose of reducing or attempting to reduce any potential loss or liability under this Contract without prejudice to this Insurance, and subject always to the terms, conditions, limitations and exclusions of this Insurance, the charges thereof shall be borne by the Insurers.[63]

Based on the clear terms of the Policy, the Sue and Labour Clause requires the insured to make reasonable and necessary attempts to reduce or save "the interests

---

[61] *Int'l Commodities Export Corp.*, 701 F. Supp. at 452.

[62] Memorandum Opinion and Order, RE 116, Page ID # 2410.

[63] Marine Cargo Insurance Policy, RE 100-2, Page ID # 1249 (emphasis added).

insured hereunder."  Reading the Policy as a whole, the "interests insured hereunder" is alumina cargo in transit that is subject to physical loss or damage.

The District Court properly noted that Century's increased transportation costs incurred during the lock closures were not incurred to protect the cargo from physical loss or damage, and therefore were not an insurable interest under the Policy.  Rather, the transportation costs were the result of Century's decision to change its business model and transport its cargo by the costlier methods of truck and rail.  As such, Century's claim for its increased transportation costs is, at its core, a claim for business interruption loss that is not included in the marine cargo policy, and therefore, the District Court properly ruled that Century's claim was not covered under the Policy's Sue and Labour Clause.

To determine whether coverage was triggered under the Sue and Labour Clause, the District Court was required to determine the "interests insured hereunder," or the insurable interests under the Policy.  It is undisputed that the covered interests under the Policy are "goods and/or merchandise and/or cargo and /or interest of all descriptions, that being the property of the Insured . . . including but not limited to Coke, Alumina, Aluminum products and related materials shipped

in and/or over."[64]  The District Court properly identified the Policy's "Interest" as insuring Century's alumina cargo in transit from physical loss or damage.[65]

The District Court noted that "the Insurable Interest provision of the policy identifies the object of insurance as shipped cargo, specifically alumina in this instance."[66]  In identifying the insurable interest under the Policy, the District Court did not create an "object of the contract" test as argued by Century.  Rather, a complete reading of the District Court's ruling indicates that the term "object of the contract" is used only one time in the opinion as follows:  "However, the object of the contract was insuring the alumina against physical loss or damage, not insuring against Century's pot-line freeze."[67]  Moreover, the District Court uses the terms insurable interest, subject matter insured, and object of the contract interchangeably to describe the interest covered by the Policy.  In sum, the District Court did not create a novel "object of the contract" test in its coverage analysis, and Century's contention to the contrary is a desperate attempt to create an error where none exists.

Century also incorrectly asserts that the District Court failed to consider a potential pot-line freeze as a second "object of the contract," or insurable interest.

---

[64] Complaint, ¶ 13, RE 1, Page ID # 4.

[65] Marine Cargo Insurance Policy, RE 100-2, Page ID # 1226.

[66] Memorandum Opinion and Order, RE 116, Page ID # 2407.

[67] Memorandum Opinion and Order, RE 116, Page ID # 2410.

The District Court noted that the parties agreed that the Policy covered alumina cargo in transit.[68] The District Court further noted that the parties disagreed about whether the Policy covered a potential pot-line freeze at Century's plants.[69] In rejecting Century's claims that the Policy covered a potential pot-line freeze, the District Court explained that it is necessary to relate, or ground, the Sue and Labour Clause to the subject matter insured "to prevent the clause from becoming an all-purpose indemnity clause for which the parties have not contracted."[70]

Century's reference to the District Court's reliance on *Hvide Marine International, Inc. v. Employers Insurance of Wausau* is also misleading. The District Court did not rely on *Hvide* to create an "object of the contract" test as Century implies.[71] Rather, the District Court cited *Hvide* to explain that it is necessary to ground the Sue and Labour Clause in the subject matter insured to prevent coverage from expanding beyond what was bargained. A complete reading of *Hvide* demonstrates that it supports the District Court's decision to grant Underwriters' motion because there, as here, the expenses at issue were not incurred

---

[68] Memorandum Opinion and Order, RE 116, Page ID # 2407.

[69] *Id.*

[70] Memorandum Opinion and Order, RE 116, Page ID # 2410 (citing *Hvide Marine Int'l, Inc. v. Employers Ins. of Wausau*, No. 88 CIV 1523 (LBS), 1989 WL 140280, at *7 (S.D.N.Y. Nov. 15, 1989)).

[71] Century's Opening Brief, Doc. 21, ECF Page 38.

in the course of protecting the cargo from physical loss or damage, but rather were related to litigation over the cause of loss.[72]  In sum, the District Court referenced *Hvide* to underscore the necessity of identifying the required nexus between coverage and claimed expenses to determine the applicability of the Sue and Labour Clause.  Century's mischaracterization of the District Court's cite to *Hvide* is yet another attempt to suggest an error in the District Court's reasoning where none exists.

After determining the insured interest in the Policy, the District Court properly rejected Century's claim that it incurred increased transportation costs because it was required to sue and labour to avoid a Marine Consequential Loss under the Policy.  The Marine Consequential Loss Clause provides coverage as follows:

> 1.  This insurance covers up to USD 3,000,000 in respect of standing charges, debt service, or profit ascertained in the of manner hereinafter provided, during the indemnity period of 15 months, due to the production during such period falling short of the standard production (hereinafter defined) as a result of loss of or damage to or delay in the delivery of the property as described in the schedule hereto (or any part thereof) caused by:
>
> 1.1  a risk which would be covered under the terms, clauses and conditions of this insurance.[73]

---

[72] Memorandum Opinion and Order, RE 116, Page ID # 2407 (citing *Hvide Marine Int'l, Inc.*, 1989 WL 140280, at *7).

[73] Marine Cargo Insurance Policy, RE 100-2, Page ID # 1237.

Thus, for the Marine Consequential Loss Clause to apply, the risk must be one that "would be covered under the terms, clauses and conditions of [the Policy]."[74] The risk is only covered under the Marine Consequential Loss Clause where there is physical loss of or damage to the subject matter insured from any external cause.

As the District Court noted, if the cargo in transit was physically damaged or lost and Century experienced a loss of revenue due to decreased production, then the Marine Consequential Loss Clause would apply.[75] But it is undisputed that Century's cargo was not subject to tangible physical loss or damage as required. The District Court provided a proper explanation of coverage under the Marine Consequential Loss Clause, explaining that even if the clause provided benefits for delayed delivery, "the definition of 'standard production' is the revenue of the goods as they were reasonably expected to be produced during the Indemnity period but for the contingency."[76] Century presented no evidence that it experienced any decrease in its aluminum production due to delay. Because Century did not satisfy any of the conditions under the Marine Consequential Loss Clause, the District Court properly rejected Century's argument in this regard.

None of the disputed facts alleged by Century to establish an issue regarding

---

[74] *Id.*

[75] Memorandum Opinion and Order, RE 116, Page ID # 2409.

[76] *Id.*

the "imminent loss" referenced in the Sue and Labour Clause involve facts that are material to the coverage issue.[77] The documents cited in Century's brief relate to Century's transportation plans and inventory supply. But the parties do not dispute that Century altered its transportation system to address potential inventory issues. Rather, the parties dispute whether Century's supply issues, as they related to a potential pot-line shutdown, amounted to a covered loss. As explained by the District Court, they did not. Century's reliance on extraneous evidence is irrelevant and does not provide a basis to disrupt the District Court's ruling that coverage was not triggered under the Policy's Sue and Labour Clause.

Finally, regarding Century's convoluted assertion that "[t]he District Court's consideration of the concept of the Cargo Policy's purported 'object' is at odds with Kentucky law's binding principles of contract interpretation, as it is not a court's role to engage in a *post hoc* analysis of what the parties meant for the contract to be" seriously mispresents the District Court's ruling.[78] Again, this is a coverage dispute regarding a marine cargo insurance policy. To analyze the merits of Century's claim in the context of Underwriters' motion for summary judgment, the District Court had to determine what risk the Policy covered. The District Court did this by reciting

---

[77] Century's Opening Brief, Doc. 21, ECF Page 40.

[78] *Id.*

unambiguous Policy terms regarding the "Interest" insured, namely cargo in transit. The District Court further recognized that the Policy expressly conditioned recovery under the Sue and Labour Clause to those instances where the cargo was subject to physical loss or damage. Century's argument that the District Court's application of the Policy terms constitutes an *ad hoc* analysis of the parties' intent is baseless and unsupported by the record.

In sum, the District Court neither created nor relied on an "object of the contract" test. It properly determined from the clear Policy language that the insurable interest under the Policy was the alumina cargo in transit, not increased transportation costs or a potential pot-line freeze at Century's plants. Thereafter, the District Court properly determined that Century's claim was not covered under the Policy's Sue and Labour Clause because the claim involved increased transportation costs that were not related to an insured interest under the Policy. For all these reasons, the District Court's ruling regarding the Sue and Labor Clause should be affirmed.

### D. The District Court Properly Ruled That Century's Claim Was Not Covered Under the Policy's Shipping Expense Clause

The District Court also correctly rejected Century's argument that it was entitled to additional coverage under the Policy's Shipping Expense Clause. The Shipping Expense Clause provides as follows:

> When the subject matter insured is not delivered to the
> destination contemplated due to circumstances beyond the
> control of the Insured this insurance also to pay reasonable
> direct charges incidental to shipping which have been or
> may be incurred by the Insured.[79]

Underwriters' investigation confirmed that none of the alumina in transit on the eleven barges in question failed to reach its intended destination.[80] Rather, one barge proceeded on its route and the cargo from the ten remaining barges was offloaded onto trucks and transported to Century's plants. Century did not produce any evidence that any of its alumina on the initial barges or in any of the subsequent shipments failed to reach its intended destination. As the District Court explained, if Century had established that any of its alumina was not delivered to its plants for reasons beyond its control, Century would not have realized the benefit of its transportation costs and would then have sustained a covered loss under the Shipping Expense Clause.[81] However, all of Century's alumina was delivered to its plants, and the Shipping Expense Clause is therefore not implicated. As such, the District

---

[79] Marine Cargo Insurance Policy, RE 100-2, Page ID # 1248-1249.

[80] Deposition Testimony of Virginia Lawson, pp. 88, 122-123, RE 100-10, Page ID # 1318-1320; Deposition Testimony of Michael Fitzgerald, pp. 133 & 139, RE 100-11, Page ID # 1323-1324; Deposition Testimony of Michelle Harrison, pp. 190-192, RE 100-12, Page ID # 1335-1337; Deposition Testimony of Jeff Mahoney, p. 93, RE 100-13, Page ID # 1339; Deposition Testimony of Ágúst Hafberg, pp. 140-141, RE 100-14, Page ID # 1341-1342.

[81] Memorandum Opinion and Order, RE 116, Page ID # 2411.

Court correctly determined that Underwriters do not owe any coverage under the Shipping Expense Clause.

Century's assertion that the District Court's interpretation of the Shipping Expense Clause creates illusory coverage likewise lacks any merit. The Shipping Expense Clause provides coverage when the subject cargo "is not delivered to the destination contemplated."[82] Illusory coverage is "coverage that is at least implicitly given under its provisions and then taken away, by virtue of a prohibition or exclusion contained in the same policy."[83] The Policy provides coverage under the Shipping Expense Clause when the cargo does not reach its intended destination. The facts involved in Century's claim (where all cargo reached its intended destination) rendered the Shipping Expense Clause inapplicable. The undisputed facts of this case do not implicate a Policy exclusion, and Century's allegations of illusory coverage are misplaced.

### E. The District Court Properly Ruled That Century's Claim Was Not Covered Under the Policy's Risks Covered Clause

Century invoked the Policy's Risks Covered Clause to seek coverage for its additional transportation expenses. The Policy's Risks Covered Clause provides:

---

[82] Marine Cargo Insurance Policy, RE 100-2, Page ID # 1248-1249.

[83] *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Papa John's Int'l, Inc.*, 29 F. Supp. 3d 961 (W.D. Ky. 2014).

Without limitation to coverage otherwise provided for herein the following perils clause is incorporated herein:

Touching the adventures and perils which the Underwriters are contented to bear and do take upon themselves in this voyage, they are of the seas and inland waters, men-of-war, fire, enemies, pirates, rovers, thieves, jettison, letters of mart and countermart, surprisals, takings at sea, arrest, restraint and detainment of all Kings, Princes and People of what nation, condition or quality soever, barratry of master and mariners, and of all other like perils, losses or misfortunes that have or shall have come to the hurt, detriment or damage of the said goods and merchandise and ship, or any part thereof.[84]

This clause lists various perils of the sea, including arrest, restraint, and detainment, however, those phrases cannot be read in isolation. The Risks Covered Clause does not provide additional cover to the American Institute Cargo Clauses. Rather, it is simply a listing of the historical perils of the sea. The clause is included in marine cargo polices to list specific perils that can occur during marine transit, but the Policy nonetheless requires physical loss or damage to the cargo in transit from these specific marine perils to trigger coverage. Again, it is undisputed that Century did not sustain any physical loss or damage to any of its cargo, and therefore the District Court properly determined that Century was not entitled to additional coverage under the Risks Covered Clause.

---

[84] Marine Cargo Insurance Policy, RE 100-2, Page ID # 1248.

Century fails to cite any applicable authority to support its claim for coverage under the Risks Covered Clause.  Century incorrectly asserts that the District Court relied on *Intermetal Mexicana, S.A. v. Insurance Co. of North America*, 866 F.2d 71 (3d Cir. 1989), to give meaning to the phrase "physical loss."[85]  However, a complete reading of the District Court's ruling reflects that <u>Century</u> relied on *Intermetal Mexicana* in its opposition to Underwriters' motion to mistakenly assert that property "loss" occurs in the context of the Risks Covered Clause in the absence of possession or control of the property.[86]  As the District Court correctly recognized, in *Intermetal Mexicana*, the court determined that the cargo was lost because the owner was completely deprived of control and never regained possession.[87]  With Century's claim, the District Court correctly recognized that the lock closures by the Corps of Engineers did not operate as a seizure, or an event that would dispossess Century of its cargo, nor was there any "hurt, detriment or damage" to the cargo.[88]  Rather, at all times, Century retained ownership of its cargo as well as access to the alumina so that it could, and did, offload the cargo from the detained barges and

---

[85] Century's Opening Brief, Doc. 21, ECF Page 33.

[86] Century's Opposition to Underwriters' Motion for Summary Judgment, RE 107, Page ID # 1974.

[87] *Intermetal Mexicana*, 866 F.2d at 76.

[88] Memorandum Opinion and Order, RE 116, Page ID # 2408.

transport it to Century's plants by other means.  Century's reliance on *Intermetal Mexicana* in its opposition brief was misplaced, as are Century's claims that the Risks Covered Clause provides coverage even though Century was not completely deprived of control of its cargo.

Century also cites *Swift Spindrift, Ltd. v. Alvada Insurance Inc.*, 175 F. Supp. 3d 169, 181 (S.D.N.Y. 2016), to support its claim for coverage under the Risks Covered Clause, but that case also does not help Century's cause.  There, the court considered, and <u>rejected</u>, the applicability of "arrests, restraints and detainments" where the arrest was the result of private legal proceedings by commercial entities.[89]  Clearly, the *Swift Spindrift* decision does not provide any support for Century's position that the lock closures were the exercise of a sovereign power.

Likewise, Century erroneously relies on *Reinhold v. United States*, 167 F.2d 556 (2d Cir. 1948), to argue for coverage under the Risks Covered Clause.  In *Reinhold*, the court did examine the words "arrests, restraints and detainments" in a similar risks covered clause.  However, the court clarified that they only include activities where a government assumes "general control over the movement of a vessel" and there is "<u>paramount control</u> by the boarding party over the vessel (that

---

[89] *Swift Spindrift*, 175 F. Supp. 3d at 183-84 (emphasis added).

is) 'taken from an owner's hands.'"[90]  In *Reinhold*, the court determined that there was no arrest, restraint, or detainment to trigger coverage where the vessel carried an armed guard to protect the cargo, because the minor limitations imposed by the armed guard did not constitute "paramount control of the operations of the vessel" as contemplated by the term restraint.[91]  Here, as in *Reinhold*, the Corps of Engineers' lock closures did not result in paramount control of Century's cargo transportation operations.  To the contrary, Century always maintained ownership of and access to its cargo and had the authority to move its cargo at any time, which it did.  Clearly, *Reinhold*'s reasoning and holding are contrary to Century's conclusory statements that it is entitled to coverage under the Risks Covered Clause. Absent applicable authority, the District Court properly determined that the Corps of Engineers' intermittent lock closures did not operate as a seizure of Century's barges or cargo, nor as "hurt, detriment or damage" to the cargo sufficient to trigger coverage under the Risks Covered Clause.

Furthermore, even if the lock closures amounted to a seizure of Century's cargo, which is denied, the Risks Covered Clause still does not apply to Century's claim.  The Risks Covered Clause does not provide additional coverage for

---

[90] *Reinhold*, 167 F.2d at 558 (emphasis added).

[91] *Id.*

Century's cargo. Rather, the clause is included in the marine cargo policy to list specific perils that may occur during marine transit. As with the other clauses argued by Century, there must be physical loss or damage from the specific marine perils for coverage to be triggered under the clause. The clause specifies that there must be "hurt, detriment or damage" to the cargo during the restraint or detainment. Because Century did not experience any physical loss or damage to its cargo during the lock closures, the District Court properly ruled that Century did not have a claim for additional coverage under the Risks Covered Clause.

## CONCLUSION

For the foregoing reasons, the District Court correctly granted Underwriters' Motion for Summary Judgment based on its determination that Underwriters satisfied their obligations to Century under the Policy by paying Century the Policy's $1,000,000 sublimit of available coverage under the Extra Expense Clause, minus Century's $25,000 deductible, and that no additional coverage was afforded by the Policy. Accordingly, Underwriters respectfully request that the Court affirm the District Court's ruling.

**RESPECTFULLY SUBMITTED**, this 25th day of October, 2023.


BY: _/s/ Kyle S. Moran_
Kyle S. Moran
Jeremy T. Grabill
PHELPS DUNBAR LLP
365 Canal St. | Suite 2000
New Orleans, Louisiana 70130
Telephone: (504) 566-1311
Facsimile: (504) 568-9130
kyle.moran@phelps.com
jeremy.grabill@phelps.com

Bobby R. Miller Jr.
Ryan A. Hahn
MILLER HAHN, PLLC
2660 West Park Drive, Suite 2
Paducah, KY 42001
Telephone: (270) 554-0051
Facsimile: (866) 578-2230
bmiller@millerlaw-firm.com
rhahn@millerlaw-firm.com

***Attorneys for Defendants-Appellees,
Certain Underwriters at Lloyd's,
London***

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 9345 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14 point font.

## CERTIFICATE OF SERVICE

This will certify that a true and accurate copy of the foregoing was served on the following via the Court's CM/ECF system on the 25th day of October, 2023.

Martin H. Myers
Yuri D. Melnyk
Covington & Burling, LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533

Palmer G. Vance, II
Stolle Kennon Ogden, PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507-1380

*/s/ Kyle S. Moran*
Kyle S. Moran

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Description | Record Entry | Page ID Range |
|---|---|---|
| Complaint | RE 1 | 1-69 |
| Underwriters' Motion for Summary Judgment and Memorandum in Support | RE 100 & 101-1 | 1201-1223 |
| Marine Cargo Insurance Policy | RE 100-2 | 1224-1275 |
| New Loss Cargo Report | RE 100-4 | 1279-1284 |
| Email from J. Prince to N. Rodier dated May 10, 2018 | RE 100-7 | 1305-1306 |
| Email from N. Rodier to J. Prince dated July 23, 2018 | RE 100-8 | 1307-1310 |
| Deposition Testimony of Virginia Lawson | RE 100-10 | 1313-1320 |
| Deposition Testimony of Michael Fitzgerald | RE 100-11 | 1321-1325 |
| Deposition Testimony of Michelle Harrison | RE 100-12 | 1326-1337 |
| Deposition Testimony of Jeff Mahoney | RE 100-13 | 1338-1339 |
| Deposition Testimony of Ágúst Hafberg | RE 100-14 | 1340-1342 |
| Itemization of Undisputed Facts | RE 120 | 1365-1373 |
| Century's Opposition to Underwriters' Motion for Summary Judgment | RE 107 | 1962-1989 |
| District Court's Memorandum Opinion and Order | RE 116 | 2400-2412 |
| Final Judgment | RE 120 | 2418 |
| Century's Notice of Appeal | RE 121 | 2419-2421 |